SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-04-0361-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2001-014970 |
| JUAN VELAZQUEZ, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Jeffrey S. Cates, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
    By   Kent E. Cattani, Chief Counsel
    Capital Litigation Section
    Patricia A. Nigro, Assistant Attorney General
Attorneys for State of Arizona

LAW OFFICES OF RICHARD D. GIERLOFF, P.C.                   Phoenix
    By   Richard D. Gierloff
Attorney for Juan Velazquez
_____

**B A L E S**, Justice

¶1      After convicting Juan Velazquez of seven counts of child abuse and one count of first degree murder, a jury determined that he should receive the death penalty for the murder.  We have jurisdiction over this mandatory appeal under Article 6, Section 5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      In September 2001, Juan Velazquez was living with Virginia Venegas and her daughters, Isabella and Liana. Isabella was three years old, Liana was twenty months old, and Venegas was pregnant with Velazquez's child. Velazquez and Venegas had dated for about four months and had lived together for two months.

¶3      On the night of September 24, 2001, Velazquez severely beat Isabella. Venegas saw Velazquez shoving Isabella against a closet door. Venegas became upset and argued with Velazquez, who said he would move out. Later that night, the couple reconciled.

¶4      The next morning, Velazquez assaulted Liana while Venegas was at a job interview. Angry with the twenty-month-old girl, Velazquez held Liana's mouth shut to prevent her from crying, squeezed her stomach, and then repeatedly swept her feet out from under her, causing her to fall backwards and hit her head on the floor. After falling several times, Liana could not get up and did not respond to Velazquez's voice. Velazquez placed her on the couch and covered her with a pillow.

¶5      When Venegas returned home, Velazquez told her Liana was asleep on the couch and that Venegas should leave her alone. Velazquez showered and went to work. According to Velazquez, Liana was alive and breathing when he left. A few hours later, Venegas discovered that Liana was not breathing and called Velazquez to tell him that she thought Liana was dead. Velazquez told Venegas not to

2

do anything until he returned.

¶6        When Velazquez arrived, Liana was in fact dead.  Instead of calling 911, Velazquez went to his mother's house and got a cement rock and some wire.  He tied the rock to Liana's body and had Venegas drive him to a canal, where he dumped Liana's body.

¶7        The next day, September 26, 2001, Venegas reported Liana missing.  When police arrived, Velazquez said that he and Venegas had discovered only that morning that she was gone.  An extensive search for Liana ensued.

¶8        Shortly after the search began, police contacted the girls' father.  He came to the condominium where Venegas lived and immediately noticed that Isabella's face was swollen and bruised.  Isabella was then examined at a hospital.  She had extensive bruising, a skull fracture, and two cephalhematomas (bruises associated with swelling caused by bleeding under the surface bones of the skull).  Isabella told police that Velazquez had hurt both her and Liana.

¶9        Police interviewed Velazquez and Venegas, who both initially denied any wrongdoing.  Venegas was re-interviewed the next day, September 27, 2001, and she admitted that Liana was dead and that she had driven Velazquez to a canal where he had dumped the girl's body.  Police then arrested Velazquez.  Confronted with the information provided by Venegas, Velazquez confessed to killing Liana and assaulting Isabella.  He also admitted that he had previously physically abused both girls.  Police divers recovered

3

Liana's body from the canal on September 28, 2001.

¶10     The medical examiner concluded that Liana died from blunt force trauma to her head.  The autopsy revealed a "full thickness" skull fracture, internal hemorrhaging, and swelling of the brain. The swelling exerted pressure at the base of the skull, which impaired respiratory and cardiac functions and eventually caused Liana's death.  Liana also had many other blunt force injuries to her head, face, and body.  The medical examiner opined that Liana suffered at least six separate blows before her death.

¶11     Velazquez was indicted for the felony murder of Liana, three counts of child abuse for injuries suffered by Liana, and four counts of child abuse for injuries suffered by Isabella. On September 2, 2004, a jury convicted Velazquez of all charges.  On October 8, 2004, the same jury determined that Velazquez should receive the death penalty for the murder after finding three aggravating factors: Velazquez had been previously convicted of a serious offense; the murder was especially cruel; and the victim was under the age of fifteen.  *See* A.R.S. § 13-703(G)(2), (6), (9) (Supp. 2001).[1]  Based on the verdicts, the trial judge sentenced Velazquez to death for

---

[1]     From April 2001 through August 2002, the aggravating circumstances were listed in sub-section (G) of A.R.S. § 13-703. *See* 2001 Ariz. Sess. Laws, ch. 260, § 1; 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 1.  In 2002, following the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 609 (2002), § 13-703 was amended and the sub-section listing the aggravators was designated (F) instead of (G). *See* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 1.  We refer to the statute in effect at the time of the murder.

4

the murder and imposed sentences with a cumulative length of sixty years for the non-capital crimes.

## DISCUSSION

¶12     Velazquez raises nine issues on appeal.  For the reasons discussed below, we affirm his convictions and sentences.

### A. Jury Selection Issues

#### 1. *Witherspoon v. Illinois* Challenge

¶13     Velazquez challenges the trial court's excusing six potential jurors for cause under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and its progeny.  We review a trial court's decision to strike a potential juror for cause for abuse of discretion.  *State v. Ellison*, 213 Ariz. 116, 137 ¶ 88, 140 P.3d 899, 920, *cert. denied*, 127 S. Ct. 506 (2006).

¶14     Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is entitled to an impartial jury.  *Witherspoon*, 391 U.S. at 518; *see also State v. Anderson* (*Anderson I*), 197 Ariz. 314, 318-19 ¶ 9, 4 P.3d 369, 373-74 (2000).  Potential jurors in a capital case cannot be removed for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at 522.  A juror may, however, be removed for cause if his views on the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*,

5

469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)); *accord Anderson I*, 197 Ariz. at 318-19 ¶ 9, 4 P.3d at 373-74.

¶15 "[I]n applying this standard, reviewing courts are to accord deference to the trial court," *Uttecht v. Brown*, 127 S. Ct. 2218, 2223 (2007), because it "is in a superior position to determine the demeanor and qualifications of a potential juror," *id.* at 2231. All of the challenged jurors (Jurors 4, 33, 37, 52, 75, and 137) indicated during voir dire that opposition to the death penalty made them unable to follow the law. The trial court did not abuse its discretion in concluding that their views on the death penalty would substantially impair the performance of their duties as jurors.

¶16 Velazquez also argues that the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), and this Court's decision in *State ex rel. Thomas v. Granville* (*Baldwin*), 211 Ariz. 468, 123 P.3d 662 (2005), narrow the grounds on which a potential juror may be excused for cause. These decisions, however, do not modify *Witherspooon* and *Witt* or otherwise alter the standards for qualifying jurors in capital cases. *Cf. Uttecht*, 127 S. Ct. at 2224 (summarizing principles of *Witherspoon* and *Witt*).

### 2. *Morgan v. Illinois* Challenge

¶17 Velazquez next contends that his Sixth and Fourteenth Amendment rights to a fair and impartial jury were violated because two "death presumptive" jurors served on the jury. Velazquez did not object at trial but argues that seating these jurors was

6

structural error requiring automatic reversal. Alternatively, Velazquez contends that we should find fundamental error, which affords relief only if he "establish[es] both that fundamental error exists and that the error in his case caused him prejudice." *State v. Henderson*, 210 Ariz. 561, 567 ¶ 20, 115 P.3d 601, 607 (2005).

¶18 A defendant is entitled to "a fair trial by a panel of impartial, indifferent jurors." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (internal quotation marks omitted). "A juror who will automatically vote for the death penalty" without considering the presence of mitigating circumstances does not meet this threshold requirement of impartiality. *Id*. at 729. Under the due process guarantees of the Sixth and Fourteenth Amendments, "[i]f even one such juror is empaneled and the death sentence is imposed," the sentence must be reversed. *Id*.

¶19 Simply because a juror favors the death penalty does not, however, necessarily preclude the juror from serving on a jury; if the juror is "willing to put aside his opinions and base his decisions solely upon the evidence, he may serve." *See State v. Martinez*, 196 Ariz. 451, 459 ¶ 28, 999 P.2d 795, 803 (2000) (citation omitted). This can be determined through proper voir dire. *Morgan*, 504 U.S. at 729; *Martinez*, 196 Ariz. at 459 ¶ 28, 999 P.2d at 803.

¶20 One of the challenged jurors (Juror 62) clearly stated that he could consider a sentence less than death under certain mitigating circumstances. The other (Juror 139) also stated, in responding to

the juror questionnaire, that he would not automatically impose a death sentence. Juror 139 did not alter his answer when the trial court asked the jurors in voir dire if any of them thought a person who intentionally kills another should automatically receive the death penalty. In response to defense counsel, Juror 139 later said that he "could not see" any circumstance in which a penalty less than death would be appropriate if a defendant intended to commit the murder, was glad he committed the murder, and had no defense. These remarks did not indicate that the juror would invariably impose a death sentence in the context of this case, and defense counsel made no attempt to further elucidate the juror's views. The trial court did not commit reversible error by empaneling these two jurors.

## B. Aggravation Phase Issues

### 1. Double-counting of Victim's Age

¶21        Velazquez next argues that the jury impermissibly considered Liana's age in finding both the (G)(9) victim "under fifteen years of age" and the (G)(6) "especially cruel" aggravators. The Court, he acknowledges, has previously held that a sentencing judge may use a victim's age to establish two aggravating factors, provided that the judge does not weigh this fact "twice in balancing aggravating and mitigating circumstances." *State v. Medina*, 193 Ariz. 504, 512 ¶ 25, 975 P.2d 94, 102 (1999). Velazquez contends that we should reexamine this precept because juries now determine if a death sentence is appropriate and *Baldwin* "disavowed" the

8

"rubric" of weighing.

¶22      A jury, like a sentencing judge, may use one fact to find multiple aggravators, so long as the fact is not weighed twice when the jury assesses aggravation and mitigation. *Cf. Brown v. Sanders*, 126 S. Ct. 884, 892 (2006) (holding that jury's consideration of invalid sentencing factor will not render sentence unconstitutional if jurors may "give aggravating weight to the same facts and circumstances" in connection with other valid sentencing factors). Velazquez is also mistaken in characterizing *Baldwin* as generally rejecting the concept of "weighing" in capital sentencing. *See infra* ¶¶ 39-40. Finally, we conclude that the jury did not rely on Liana's age to find both aggravating factors.

¶23      The trial court, at Velazquez's request, instructed the jury:  "In determining whether an aggravating circumstance exists, you may consider only those statutory aggravating circumstances set forth in these instructions.  You may not consider the age of the victim in any way in deciding whether the murder was committed in an especially cruel manner."  In closing arguments, the prosecutor noted that Liana, a twenty-month-old child, had experienced great physical pain and mental anguish when she was murdered by the adult in whose care she had been placed.  By acknowledging that Liana was a helpless child when arguing she had suffered pain and anguish, the prosecutor did not improperly urge the jury to base its finding of the (G)(6) aggravator on Liana's age.

9

¶24 "We presume that the jurors followed the court's instructions" that they should not consider Liana's age in regard to the (G)(6) aggravator and that the lawyers' comments were not evidence. *See State v. Newell*, 212 Ariz. 389, 403 ¶ 68, 132 P.3d 833, 847, *cert. denied*, 127 S. Ct. 663 (2006). Velazquez has not demonstrated that any impermissible double-counting occurred.

## 2. Probable Cause Finding on Aggravating Circumstances

¶25 Velazquez argues that his Sixth, Eighth, and Fourteenth Amendment rights were violated because no probable cause finding was made on the alleged aggravating circumstances before they were presented to the jury. We have, however, rejected the argument that aggravating factors must be "preliminarily considered by the grand jury or [a] neutral arbiter and included by specific allegation as a probable cause finding in the charging document." *McKaney v. Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 270 ¶ 10, 100 P.3d 18, 20 (2004).

## 3. Especially Cruel

¶26 Velazquez contends that his Eighth Amendment rights were violated because the jury's finding of the (G)(6) "especially cruel" aggravating circumstance was not properly channeled. We review issues of constitutional law de novo. *State v. McGill*, 213 Ariz. 147, 159 ¶ 53, 140 P.3d 930, 942 (2006), *cert. denied*, 127 S. Ct. 1914 (2007).

¶27 To comport with the Eighth Amendment, a capital sentencing

system "must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (internal footnotes omitted). Although Arizona's "especially heinous, cruel or depraved" aggravator is facially vague, it can be remedied with appropriate narrowing instructions, "whether a judge or a jury makes the sentencing" decision. *Ellison*, 213 Ariz. at 138 ¶ 96, 140 P.3d at 921. "Thus, the proper inquiry is whether the jury instructions" sufficiently narrowed the "especially cruel" aggravator in this case. *Id*.

¶28 During the aggravation phase of trial, the jury was instructed as follows:

> Cruelty involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either intended to inflict mental anguish or physical pain upon the victim, or reasonably foresaw that there was a substantial likelihood that the manner in which the crime was committed would cause the victim to experience mental anguish and/or physical pain before death.

> The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

¶29 Velazquez concedes that the definition of "cruelty" comports with Arizona law, but claims that the instruction defining "especially cruel manner" was not sufficiently narrow. We have, however, sustained instructions nearly identical to those given here. *See State v. McCall*, 139 Ariz. 147, 161, 677 P.2d 920, 934

11

(1983) ("The defendant must intend that the victim suffer or reasonably foresee that there is a substantial likelihood that the victim will suffer as a consequence of the defendant's acts."). The instructions here provided clear and objective standards and properly channeled the jury's discretion.

#### 4. Previously Convicted of a Serious Offense

¶30 Velazquez challenges the application of the (G)(2) "previously convicted of a serious offense" aggravating circumstance to his case. Because Velazquez did not object to the presentation of this aggravator at trial, we review solely for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶31 The factual basis for the (G)(2) aggravator was Velazquez's conviction on count five of the indictment, in which the jury found him "guilty of knowing Child Abuse under circumstances likely to cause death or serious physical injury (involving Isabella['s] . . . skull fracture/head injury)." The indictment alleged that this abuse had occurred "on or between the 24th day of September, 2001 and the 25th day of September, 2001," while Liana's murder occurred on September 25, 2001.

¶32 Under the version of (G)(2) in effect when Velazquez murdered Liana, this aggravator could not be based on convictions for serious offenses committed contemporaneously with the capital murder. *See State v. Rutledge*, 206 Ariz. 172, 178 ¶ 25, 76 P.3d 443, 449 (2003) (holding that aggravator could not apply to attempted

12

murder and armed robbery committed contemporaneously with murder). The (G)(2) aggravator could, however, be based on convictions for serious offenses that were committed separately from the murder, even if the murder and serious offense convictions resulted from the same trial. *See id.* at 176-77 n.4 & ¶¶ 20-21, 76 P.3d at 447-48 & n.4. After redesignating (G)(2) as (F)(2) in 2002, the legislature in 2003 amended the statute to provide that a "serious crime" committed contemporaneously with the murder is sufficient to establish this aggravator. *See* 2003 Ariz. Sess. Laws, ch. 255, § 1; *Rutledge*, 206 Ariz. at 176 n.3 ¶ 17, 76 P.3d at 447 n.3.

¶33 Velazquez argues that the evidence showed that the abuse causing Isabella's skull fracture occurred at the same time as his murderous assault on Liana; the 2001 version of (G)(2) therefore did not apply; and applying the 2003 amended version of (F)(2) to him would violate the Ex Post Facto Clause of the Federal Constitution. He further contends that the jury's consideration of the "invalid" (G)(2) sentencing factor renders his death sentence unconstitutional under *Brown*, 126 S. Ct. 884.

¶34 The applicable version of (G)(2) is the statute in effect in 2001 when Velazquez committed the murder. *See Rutledge*, 206 Ariz. at 176 n.3 ¶ 17, 76 P.3d at 447 n.3. Under that statute, Velazquez was entitled to an instruction requiring the jury to find, for purposes of the (G)(2) aggravator, that the abuse of Isabella described in count five had occurred separately from the murder of

13

Liana. *See id*. at 178 ¶ 25, 76 P.3d at 449. He did not, however, request such an instruction, and he has not established the prejudice necessary for its omission to be fundamental error.

¶35 In his confessions, Velazquez admitted assaulting Isabella on the night before he murdered Liana. He now argues that his attacks on the two girls must have occurred simultaneously because when Isabella was taken to the hospital on the morning of September 26, her injuries indicated she had been assaulted within the prior twenty-four hours. We disagree. The evidence regarding Isabella's injuries did not establish exactly when she had received the skull fracture, but it was consistent with Velazquez's account of having separately assaulted Isabella before killing Liana. No reasonable juror could have concluded that Velazquez, contrary to his own statements, assaulted Isabella as part of the same series of events as Liana's murder on September 25.

¶36 Because we conclude that the (G)(2) aggravator was properly applied to Velazquez under the 2001 version of the statute, we reject his argument that this aggravator was based on the 2003 amended version of (F)(2) in violation of the Ex Post Facto Clause. We similarly reject his argument that the jury's improper consideration of an invalid sentencing factor requires reversal of his sentence under *Brown*.

14

## C. Penalty Phase Issues

### 1. Jury Instructions

¶37     Velazquez alleges five errors in the penalty phase jury instructions:  (1) the sentencing process was mischaracterized as "weighing"; (2) the sentencing process was mischaracterized as "fact-finding"; (3) the nature of the sentencing decision-making process was never correctly described; (4) the instructions created a presumption of death; and (5) the consideration of mitigation evidence was improperly restricted.[2]  Although we generally review de novo whether the penalty phase jury instructions correctly state the law, *Baldwin*, 211 Ariz. at 471 ¶ 8, 123 P.3d at 665, absent an objection by the defendant, we review for fundamental error, *see State v. Anderson* (*Anderson II*), 210 Ariz. 327, 345 ¶ 72, 111 P.3d 369, 387 (2005).

¶38     With respect to the first four alleged errors, Velazquez contends that the instructions given are inconsistent with our subsequent opinion in *Baldwin*.  We disagree.

¶39     *Baldwin* prospectively "discourage[d] the use of instructions that inform jurors that they must find that mitigating circumstances *outweigh* aggravating factors before they can impose

---

[2]     Velazquez raises a similar challenge to the instructions given in voir dire.  He claims the sentencing process was mischaracterized as both fact-finding and weighing and that the instructions created a presumption of death.  Because his arguments regarding the voir dire mirror the arguments made regarding the penalty phase instructions, our analysis applies to both.

15

a sentence other than death." 211 Ariz. at 473 ¶ 21, 123 P.3d at 667 (emphasis added). The trial court did not use such "outweighing" language in instructing the jury here. Instead, the trial court, over an objection by Velazquez, used the term "weigh" in instructing the jurors that they must individually determine the existence and weight of any mitigation and then "weigh it against [any] aggravating circumstances . . . to determine whether the mitigation is sufficiently substantial to call for leniency." Contrary to Velazquez's argument, *Baldwin* does not generally prohibit trial courts from informing jurors that they must each weigh mitigation evidence against aggravation evidence.

¶40        Instead, *Baldwin* reaffirms that each juror must individually determine the existence and significance of any mitigating factors and whether such factors are "sufficiently substantial" to warrant leniency. "Each juror must determine whether, in that juror's individual assessment, the mitigation is of such quality or value that it warrants leniency in a particular case." *Id*. at 473 ¶ 18, 123 P.3d at 667. Although this process might be characterized as the juror "weighing" mitigating and aggravating factors, a juror need not determine that mitigation "outweighs" aggravation in order to vote for leniency. *See id.* at 471 n.3 ¶ 12, 123 P.3d at 665 n.3. Thus, *Baldwin* noted that jury instructions in future cases should avoid "outweighing" language and should clearly explain "that a juror may not vote to impose the death penalty unless

16

he or she finds, in the juror's individual opinion, that 'there are no mitigating circumstances sufficiently substantial to call for leniency.'" *Id.* (quoting A.R.S. § 13-703(E)).

¶41    Velazquez also misconstrues *Baldwin* with regard to the finding of mitigating circumstances. The case does not, as Velazquez contends, assert that the finding of mitigating circumstances is not a fact question. *Baldwin* makes clear that the finding of mitigating circumstances is a fact question; it is only the decision whether any mitigating circumstances are sufficiently substantial to warrant leniency that is not a fact question. *Id*. ("[T]he determination whether mitigation is sufficiently substantial to warrant leniency is not a fact question . . . , but rather is a sentencing decision to be made by each juror based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist.").

¶42    The trial court here properly instructed the jurors that the "[d]etermination of what circumstances are mitigating and the weight to be given to any mitigation is for each juror to resolve individually based upon all the evidence presented during all phases of this trial." The trial court further instructed the jurors that "[i]n reaching a reasoned, moral judgment about which penalty is justified and appropriate, you must decide how compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factors." We reject

17

Velazquez's argument that the instructions given here differed from those approved in *Baldwin* in a way that inaccurately described the nature of the sentencing process.

¶43    Additionally, Velazquez claims that a presumption of death was created when the jury was instructed: "[I]f you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death."  This instruction comports with A.R.S. § 13-703(F) (stating that the trier of fact "shall impose a sentence of death if the [trier of fact] finds . . . that there are no mitigating circumstances sufficiently substantial to call for leniency").  Instructions such as those given here do not offend the Eighth Amendment as long as the jury is allowed to consider all relevant mitigating evidence.  *State v. Tucker*, ___ Ariz. ___, ___ ¶ 73, 160 P.3d 177, 196 (2007) (citing *Kansas v. Marsh*, 126 S. Ct. 2516, 2525-26 (2006); *Blystone v. Pennsylvania*, 494 U.S. 299, 306-07 (1990)).

¶44    Velazquez also contends that the jury was restricted in considering mitigation evidence because it was instructed to "consider any other information admitted as evidence that is relevant in determining whether to impose a sentence less than death, so long as it relates to an aspect of the defendant's background, character, propensities, record, or circumstances of the offense."  These instructions are consistent with both *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), and A.R.S. § 13-703(H).  The jury was told that it could

18

consider factors other than those submitted by the parties as long as they were relevant. The instructions did not improperly restrict the jury's consideration of mitigation evidence.

## 2. Prosecutorial Misconduct

¶45 Velazquez alleges three instances of prosecutorial misconduct in the State's penalty phase opening statement.[3] We will reverse a conviction for prosecutorial misconduct if "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial." *Anderson II*, 210 Ariz. at 340 ¶ 45, 111 P.3d at 382 (citation omitted).

¶46 Velazquez first contends that the prosecutor improperly suggested that one of the defense mental health experts, psychologist Ricardo Weinstein, had fabricated his report and engaged in "result-reaching." Defense counsel did not refer to Weinstein in his penalty phase opening statement. The prosecutor, anticipating Weinstein would testify, told the jurors that "Dr. Weinstein's QEEG is interesting." (The term QEEG or quantitative EEG refers to a quantitative encephalogram, a type of brain wave test that is also

---

[3] Velazquez also claims that the prosecutor committed misconduct by asking a potential juror in voir dire if he would "be able to sift through all the baloney and make [his] decision." Rather than describing mitigation evidence as baloney, as Velazquez suggests, this comment addresses the need for jurors to sort through *all* of the evidence presented to determine the factors that the juror finds mitigating. The comment, while perhaps inartful, did not raise an objection or constitute misconduct requiring reversal of the convictions or sentences below.

called brain mapping.) The prosecutor said Weinstein had given Velazquez "this QEEG which is the regular EKG [sic], but come[s] out in colors. And somehow he can interpret the colors. And I don't know where the colors come from. When he interprets them, he can see brain dysfunction." The prosecutor also told the jury that Weinstein "knew what the results of the QEEG was [sic] going to be before he gave it," because he "believes that all people on death row who actually killed someone have brain dysfunction."

¶47    Velazquez did not object to these comments, and we thus review for fundamental error. *State v. Roque*, 213 Ariz. 193, 228 ¶ 154, 141 P.3d 368, 403 (2006). Weinstein ultimately did not testify at trial due to what Velazquez describes as logistical problems. Weinstein's report and the results of the QEEG test he administered were not admitted into evidence.

¶48    "A prosecutor has wide latitude in presenting arguments to the jury . . . ." *State v. Morris*, ___ Ariz. ___, ___ ¶ 58, 160 P.3d 203, 216 (2007). It is improper, however, "to imply unethical conduct on the part of an expert witness" in the absence of evidentiary support. *State v. Hughes*, 193 Ariz. 72, 86 ¶ 59, 969 P.2d 1184, 1198 (1998).

¶49    The prosecutor indicated that Weinstein had used a dubious QEEG test to justify pre-determined conclusions and thereby implied unethical conduct by the expert. These comments were improper because the prosecutor lacked evidentiary support for her attack on

20

Weinstein's anticipated testimony. Indeed, the prosecutor acknowledged in her opening statement that the State had not yet interviewed this expert and did not "really" know what he was going to say.

¶50     Although the prosecutor's statements were improper, Velazquez cannot show that they caused prejudice sufficient to constitute fundamental error. Weinstein, as noted, did not testify and his report and test results were not admitted. After the prosecutor's remarks in opening statement, there were only two other brief references to Weinstein during the penalty phase. Psychiatrist Jack Potts, the defense's primary mental health expert, noted in his report, which was admitted, that he had "relied upon other experts in the information they obtained regarding Mr. Velasquez [sic] as well as his history," and he listed Weinstein among five experts whose reports he had reviewed. Potts testified that he also reviewed Weinstein's audio-taped interview of Velazquez, but did not comment further on anything done by Weinstein. The State's mental health expert, psychologist Bradford Bayless, acknowledged on cross-examination that he had not reviewed any completed report or evaluation by Weinstein. The jury thus did not receive Weinstein's results. Moreover, the jury was instructed that the lawyer's comments were not evidence, and we presume that jurors follow their instructions, *Newell*, 212 Ariz. at 403 ¶ 68, 132 P.3d at 847.

¶51     Velazquez also claims that the prosecutor implied "that

21

defense counsel [was] complicite [sic] in fabricating medical mitigation evidence." In her opening statement, the prosecutor said that Weinstein had produced QEEG test results a month after the expert had submitted an affidavit saying his testing equipment had malfunctioned. After describing these events, the prosecutor remarked, "Now, I don't know how that could happen." Defense counsel objected, and the trial court instructed the jury to disregard the statement.

¶52 Velazquez's objection preserved for appeal his challenge to the prosecutor's remark. *Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403. Although "it is improper to impugn the integrity or honesty of opposing counsel," *Newell*, 212 Ariz. at 403 ¶ 66, 132 P.3d at 847, it does not appear that the prosecutor's comment was directed at the defense attorney. Rather, it seems to be directed at Weinstein, a fact that Velazquez appears to concede.

¶53 This comment was nonetheless improper, because it implies unethical conduct by an expert in the absence of evidentiary support. *Hughes*, 193 Ariz. at 86 ¶ 59, 969 P.2d at 1198. The jurors, however, were promptly instructed to disregard the prosecutor's statement after the objection was made. The jurors were also instructed at the beginning and close of the penalty phase that statements by the lawyers were not evidence. Given the trial court's corrective actions, no reversible error occurred. *See Anderson II*, 210 Ariz. at 342 ¶ 50, 111 P.3d at 384.

¶54 Velazquez also alleges that the prosecutor committed misconduct by implying that Potts fabricated a diagnosis. Again, Velazquez did not object at trial, so we review for fundamental error. *Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.

¶55 The prosecutor highlighted the fact that Potts changed his initial diagnosis of Velazquez after reviewing the report prepared by the State's expert. Based on these remarks, Velazquez contends that the prosecutor here, like the prosecutor in *Hughes*, "improperly argued that mental health experts in general create excuses for criminals."

¶56 The prosecutor's remarks did not improperly argue that Potts had fabricated a diagnosis. "[T]here is no constitutional prohibition against the State arguing that the [mitigation] evidence is not particularly relevant or that it is entitled to little weight." *Anderson II*, 210 Ariz. at 350 ¶ 97, 111 P.3d at 392. The prosecutor's arguments accurately discussed the inconsistencies between Potts's reports and testimony in an effort to show that this mitigation evidence deserved little weight. *See id.*; *Roque*, 213 Ariz. at 229 ¶ 156, 141 P.3d at 404. Therefore, the arguments did not constitute misconduct.

¶57 When addressing prosecutorial misconduct, we look not only to whether each alleged instance of misconduct warrants reversal on its own, but also to whether it "contribute[s] to a finding of persistent and pervasive misconduct." *Roque*, 213 Ariz. at 228 ¶ 155,

23

141 P.3d at 403. If the cumulative effect of the conduct "so permeate[s] the entire atmosphere of the trial with unfairness that it denie[s the defendant] due process," *id*. at 230 ¶ 165, 141 P.3d at 405, it can warrant reversal even if the individual instances would not do so by themselves. Even when viewed cumulatively, the instances of misconduct that occurred here do not warrant reversal.

## D. Independent Review

¶58 Because Liana's murder occurred before August 1, 2002, this Court independently reviews the "findings of aggravation and mitigation and the propriety of the death sentence." A.R.S. § 13-703.01(A) (2001); *see* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7.

## 1. Aggravating Circumstances

### a. Previously Convicted of a Serious Offense

¶59 To establish the (G)(2) aggravator, the State must prove beyond a reasonable doubt that Velazquez has been or "was previously convicted of a serious offense, whether preparatory or completed." A.R.S. § 13-703(G)(2). The jury found Velazquez "guilty of knowing Child Abuse under circumstances likely to cause death or serious physical injury (involving Isabella['s] . . . skull fracture/head injury)." This crime is a "serious offense" under A.R.S. § 13-703(I)(2)(f). Moreover, this offense was established based on Velazquez's assault on Isabella before he killed Liana and did not arise from the same set of events as the murder. The (G)(2) aggravator

24

was proven beyond a reasonable doubt.[4]

## b. Especially Cruel

¶60        The (G)(6) "especially cruel" aggravator is established if the State proves beyond a reasonable doubt that "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997) (citation omitted).

¶61        The State proved beyond a reasonable doubt that Liana experienced physical pain.  Velazquez told police that he suffocated Liana, squeezed her stomach, and swept her feet out from under her, causing her to hit her head on the ground.  After being tripped several times, Liana could not to get up and did not respond to Velazquez's voice.  Nonetheless, she was alive and still breathing.

¶62        The medical examiner's testimony revealed that Liana had sustained several blunt force injuries before her death, as evidenced by extensive bruising to her head, face, and body; a bloody nose; and abrasions to her face.  She also suffered a fractured skull, which

---

[4]      Our conclusion on this point is not affected by Velazquez's telling Bayless in a July 2004 interview that he had knocked both Liana and Isabella down at the same time by sweeping their feet out from under them.  The tape recording Bayless made of this interview was provided to the prosecutor and defense counsel after the guilt and aggravation phases of Velazquez's trial; the recording was admitted into evidence during the mitigation phase.  Velazquez may have assaulted Isabella both the night before and the same day he killed Liana, but we conclude that Isabella's skull fracture resulted from an assault preceding the murder, consistent with Velazquez's confession in September 2001.

caused brain swelling and blood collection under her scalp and skull. The head wounds impaired her breathing and cardiac functions, ultimately causing her death.

¶63 In our independent review, we find that Liana was conscious when she sustained the skull fracture that caused her death. We also find that Liana experienced intense physical pain as she was suffocated, squeezed, tripped, and left to die. The (G)(6) aggravator was proven beyond a reasonable doubt.

### c. Victim Under Fifteen Years of Age

¶64 To establish the (G)(9) aggravator, the State must prove that Velazquez "was an adult at the time the offense was committed . . . and the murdered person was under fifteen years of age." A.R.S. § 13-703(G)(9). Velazquez was twenty-three years old at the time of the crime. Liana was twenty months old. The (G)(9) aggravator was proven beyond a reasonable doubt.

### 2. Mitigating Circumstances

¶65 Velazquez presented two statutory and five non-statutory mitigating circumstances. He first alleged that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired." *See id.* § 13-703(H)(1). To establish this mitigating circumstance, Velazquez presented evidence that he has a personality disorder. Although "personality or character disorders usually are not sufficient to satisfy this statutory mitigator," *State v. Kayer*, 194 Ariz. 423,

26

437 ¶ 49, 984 P.2d 31, 45 (1999), we nonetheless consider evidence of a personality disorder to determine if it constitutes a non-statutory mitigating circumstance, *State v. McMurtrey*, 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983).

¶66    Three mental health professionals testified that Velazquez suffers from a personality disorder. Stan Cabanski, a psychologist who performed an evaluation of Velazquez at age seventeen, testified that Velazquez then exhibited "trends" of Borderline Personality Disorder ("BPD"). Cabanski explained that he did not officially diagnose Velazquez with BPD at the time, because a personality disorder cannot be diagnosed until age eighteen. Bayless, a psychologist retained by the State, similarly diagnosed Velazquez with BPD. Potts, the psychiatrist retained by the defense, also testified, though his diagnosis was less clear. At trial, Potts testified that Velazquez suffers from Borderline Schizophrenia, but he also noted that Velazquez was receiving treatment for Schizoaffective Disorder and probable BPD. In a letter dated August 17, 2004, however, Potts diagnosed Velazquez with "a Mood Disorder, [not otherwise specified] or possibly a Schizoaffective Disorder."

¶67    All three experts testified that Velazquez has trouble controlling his impulses; however, Bayless's report expressly states: "Velazquez was fully aware of his behavior at the time of the offense. He knew it was wrong and was aware of the potential damage to the children. Mr. Velazquez'[s] abusive behavior was

27

neither the result of some psychotic process nor the byproduct of neurological impairment."

¶68    The second mitigating circumstance presented was Velazquez's age.  This is a mitigating circumstance pursuant to A.R.S. § 13-703(H)(5).  In assessing this mitigator, we consider not only the defendant's chronological age, but also "his level of intelligence, maturity, past experience, and level of participation in the killings."  *State v. Poyson*, 198 Ariz. 70, 80 ¶ 37, 7 P.3d 79, 89 (2000).

¶69    Velazquez was twenty-three years old when he murdered Liana.  He was working as a home loan officer and had two daughters of his own.  He is of average intelligence, and many family members testified that he served as a father-figure to his younger siblings.  Velazquez also has a lengthy criminal history.  As a minor, Velazquez belonged to a street gang, had several curfew violations, and violated his juvenile probation by carrying a concealed weapon and abusing drugs. As an adult, Velazquez was arrested nine times before his arrest in this case.  None were felony arrests; many concerned domestic disputes with a former girlfriend.

¶70    Age is established as a mitigating factor, but we afford it little weight given Velazquez's criminal history, average intelligence, maturity level, and the fact that he committed the murder on his own.  *See id.* at 80-81 ¶ 37, 7 P.3d at 89-90 (stating that defendant's age will be given little weight if "defendant has

28

a substantial criminal history or was a major participant in the commission of the murder").

¶71 Velazquez's third proffered mitigating circumstance was the physical and emotional abuse he suffered as a child. The fourth mitigating circumstance offered was Velazquez's dysfunctional family. Because these two mitigating factors are related, we discuss them together.

¶72 Velazquez was raised in a toxic environment. As a child, he suffered physical and emotional abuse at the hands of his father and neglect by his mother. Both parents were substance abusers, and his mother's family has a history of mental illness. We find that these non-statutory mitigating circumstances were sufficiently proven by a preponderance of the evidence.

¶73 The fifth mitigating circumstance presented was Velazquez's drug and alcohol abuse. Velazquez presented evidence that his substance abuse began at a very early age. This mitigating circumstance was proven by a preponderance of the evidence, but Velazquez did not establish that he was under the influence of drugs or alcohol at the time of the murder.

¶74 The last two mitigating circumstances presented were Velazquez's remorse and the impact the execution would have on his family. Velazquez spoke in allocution at the end of the penalty phase. He then expressed remorse for the murder, apologized to Liana's family, and accepted responsibility for his conduct. He also

presented evidence that his family would be negatively affected by his execution. Both mitigating factors were established by a preponderance of the evidence.

### 3. Propriety of Death Sentence

¶75    In reviewing the propriety of the death sentence, "we consider the quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Glassel*, 211 Ariz. 33, 55 ¶ 93, 116 P.3d 1193, 1215 (2005), *cert. denied*, 126 S. Ct. 1576 (2006) (citation omitted). Velazquez presented considerable mitigation evidence at trial, demonstrating a painful history of physical and emotional abuse, family dysfunction, substance abuse, and mental illness. On balance, however, we do not find these circumstances sufficiently substantial to warrant a sentence less than death given the circumstances of the crime. We thus uphold Velazquez's death sentence.

### E. Issues Preserved for Federal Review

¶76    To avoid preclusion, Velazquez raises fourteen additional constitutional claims that he states have been rejected in previous decisions by the Supreme Court or this Court. The attached Appendix lists the claims raised by Velazquez and the decisions he identifies as rejecting them.

30

## CONCLUSION

¶77    For the foregoing reasons, we affirm Velazquez's convictions and sentences.

_____
W. Scott Bales, Justice


CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice

**APPENDIX**

Velazquez raises the following claims to preserve them for federal review:

1.   The death penalty is *per se* cruel and unusual punishment.  Both the United States Supreme Court and this Court have rejected this argument. *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Salazar*, 173 Ariz.399, 411, 844 P.2d 566, 578 (1992); *State v. Gillies*, 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983).

2.   Execution by lethal injection is cruel and unusual punishment. This Court has previously determined lethal injection to be constitutional.  *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

3.    The statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstances and no mitigating circumstances exist. This Court has rejected this challenge.  *Walton v. Arizona*, 497 U.S. 639, 648 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 609 (2002); *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996); *State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995).

4.   The death statute is unconstitutional because it fails to guide the sentencing jury.  This Court has rejected this.  *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

5.   Arizona's death statute unconstitutionally requires defendants to prove that their lives should be spared.  This Court rejected this claim in *State v. Fulminate*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

6.   The statute unconstitutionally fails to require either cumulative consideration of multiple mitigating factors or that the jury make specific findings as to each mitigating factor.  This Court has rejected this claim.  *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995); *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994); *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

7.    Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence.  This Court has rejected that contention.  *See State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

8.    The statute is unconstitutional because there are no statutory standards for weighing.  This was rejected in *State v. Atwood*, 171 Ariz. 576, 645-46 n.21(4), 832 P.2d 593, 662-63 n.21(4) (1992), *overruled on other grounds by State v. Nordstrom*, 200 Ariz. 229, 25 P.3d 717 (2001).

9.    Arizona's death statute insufficiently channels the sentencer's discretion in imposing the death sentence.  This Court has rejected this.  *State v. West*, 176 Ariz. 432, 454, 862 P.2d 192, 214 (1993); *Greenway*, 170 Ariz. at 164, 823 P.2d at 31.

10. Arizona's death statute is unconstitutionally defective because it fails to require the state to prove that death is appropriate.  This court rejected this argument in *Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605.

11. The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards.  This Court rejected a similar claim in *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

12. Death sentences in Arizona have been applied arbitrarily and irrationally and in a discriminatory manner against impoverished males whose victims have been Caucasian.  This Court rejected the argument that the death penalty has been applied in a discriminatory manner in *West*, 176 Ariz. at 455, 862 P.2d at 215.

13. The Constitution requires a proportionality review of a defendant's death sentence.  This Court rejected this argument. *See Salazar*, 173 Ariz. at 416, 844 P.2d at 583; *State v. Serna*, 163 Ariz. 260, 269-70, 787 P.2d 1056, 1065-66 (1990).

14. There is no meaningful distinction between capital and non-capital cases.  This was rejected in *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.