IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**THE STATE OF ARIZONA,**
*Appellee,*

*v.*

**CHRISTOPHER MATHEW PAYNE,**
*Appellant.*

———————

No. CR-09-0081-AP
Filed November 21, 2013

———————

Appeal from the Superior Court in Pima County
The Honorable Richard S. Fields, Judge
No. CR20070973
**AFFIRMED**

———————

COUNSEL:

Thomas C. Horne, Arizona Attorney General, Kent E. Cattani (argued), former Chief Counsel, Criminal Appeals/Capital Litigation, Jeffrey A. Zick, Chief Counsel, Criminal Appeals/Capital Litigation, Amy Pignatella Cain, Assistant Attorney General, Tucson, for State of Arizona

Lori J. Lefferts, Pima County Public Defender, Robert J. Hirsh, former Pima County Public Defender, Frank P. Leto (argued), Deputy Public Defender, Kristine Maish, Deputy Public Defender, Tucson, for Christopher Mathew Payne

———————

CHIEF JUSTICE BERCH authored the amended opinion of the Court, in which JUSTICE PELANDER, JUSTICE BRUTINEL, and JUSTICE TIMMER joined, and VICE CHIEF JUSTICE BALES concurred in part and dissented in part.

———————

CHIEF JUSTICE BERCH, amended opinion of the Court:

¶1        Christopher Mathew Payne was convicted of two counts of first degree murder, three counts of child abuse, and two counts of concealing a dead body, and was sentenced to death for each murder. We have jurisdiction of this automatic appeal pursuant to Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

¶2        Christopher Mathew Payne and his girlfriend, Reina Gonzales, starved and abused Payne's children, Ariana, age 3, and Tyler, age 4, until they died.

¶3        Payne left Ariana and Tyler with Gonzales while he worked, first driving for a medical transportation company and later selling heroin. Gonzales called Payne at work several times a day to complain about the children, even purportedly threatening to kill them if Payne did not make them behave.

¶4        Payne began punishing Ariana and Tyler by locking them in a closet while he was away. By late June 2006, the children were kept in the closet permanently. Payne initially fed them sandwiches once a day, but after about a month, he stopped feeding them at all. Payne checked on the children perhaps once a day, but he did not bathe them or let them out to use the bathroom or get fresh air.

¶5        Sometime in August 2006, Payne discovered that Ariana had died. He nonetheless left her in the closet with Tyler, who was still alive. The next day, Payne stuffed Ariana's body into a duffel bag, which he eventually put back in the closet with Tyler. Payne found Tyler dead approximately one week later.

---

[1]        "We view the facts in the light most favorable to sustaining the verdict." *State v. Dann* (*Dann I*), 205 Ariz. 557, 562 ¶ 2, 74 P.3d 231, 236 (2003).

**¶6**　　　In mid-September, Payne put the children's bodies in a blue tote box, which he placed in a rented storage unit.  After Payne failed to pay the rental fee, staff opened the unit.  They found only the tote inside, which they said smelled "really bad," so they threw it in a dumpster.  A staff member became concerned about the smell and called the police two days later.

**¶7**　　　The police found Ariana's partially decomposed body inside the tote.  She had twelve broken ribs, a broken spine, and a broken shoulder.  After finding Ariana's body, the police did not search the dumpster further.  The investigation led police to Payne and Gonzales, whom they located at a motel.  The officers asked Payne to accompany them to the station to answer questions, but he refused to go without his attorney.  They then arrested him on an unrelated warrant.

**¶8**　　　At the station, Payne confessed to not obtaining help for the children and allowing them to die in his care.  Police never found Tyler's body.  In searching Payne's former apartment, police found blood on the walls inside the closet, an opening in the closet wall stuffed with feces and human hair, and several patches of body fluids on the carpet.

**¶9**　　　The State charged Payne and Gonzales with first degree murder and other crimes.  In exchange for testifying, the State allowed Gonzales to plead guilty to two counts of second degree murder, for which she was given concurrent 22-year prison sentences.  The jury found Payne guilty of three counts of child abuse, two counts of concealing a dead body, and two counts of first degree murder.  The jury also found three aggravating factors:  especial cruelty, heinousness, or depravity, A.R.S. § 13-751(F)(6); multiple homicides, *id.* § 13-751(F)(8); and young age of the victims, *id.* § 13-751(F)(9).  This automatic appeal followed the imposition of death sentences for the two murders.

## II. DISCUSSION[2]

### A. Jury Selection

¶10        The Sixth Amendment to the United States Constitution entitles a defendant to an impartial jury. *State v. Velazquez*, 216 Ariz. 300, 306 ¶ 14, 166 P.3d 91, 97 (2007). Payne argues that the trial court erred by dismissing some jurors improperly and failing to dismiss others.

#### 1.  Juror 49

¶11        Based on Juror 49's responses to the juror questionnaire, the trial court excused that juror because serving on the jury would interfere with her school schedule. Prospective jurors "shall" be excused if serving on a jury would cause "undue or extreme physical or financial hardship," A.R.S. § 21-202(B)(4), or "undue or extreme hardship under the circumstances," *id.* § 21-202(B)(6). Payne initially expressed concern about dismissing Juror 49 "without more questioning," but did not object to her dismissal after the court explained the reasons for dismissing her. We thus review the decision to strike Juror 49 for fundamental error. *See State v. Moody*, 208 Ariz. 424, 449-50 ¶ 85, 94 P.3d 1119, 1144-45 (2004); *State v. Cañez* (*Cañez I*), 202 Ariz. 133, 147 ¶ 30, 42 P.3d 564, 578 (2002).

¶12        In her questionnaire, Juror 49 said that service would pose a substantial hardship because she was a student and had classes on trial days. Payne claims there was discriminatory intent in her dismissal, but points to no evidence of such intent. Given the student's school-related conflict and lack of evidence of discriminatory intent, the judge did not commit fundamental error by excusing her.

---

[2]        Payne cites state and federal constitutional provisions and raises several claims in passing without developing arguments. We consider issues not argued to be waived and therefore do not address them. *See* Ariz. R. Crim. P. 31.13(c)(1)(vi) (requiring appellate briefs to "contain the contentions . . . with respect to the issues presented, and the reasons therefor").

### 2. Juror 74

**¶13** The trial court dismissed Juror 74 for cause based on hardship and her opposition to the death penalty. Juror 74's questionnaire stated that she belonged to a group advocating the abolition of the death penalty, would never vote to impose it under any circumstances, and was personally, morally, or religiously opposed to capital punishment. She also indicated that serving would cause undue hardship because she planned to accompany her elderly parents to the east coast twice during the scheduled trial period. Over Payne's objection, the trial court dismissed the juror without affording Payne an opportunity to rehabilitate her. We review this ruling for an abuse of discretion. *See State v. Dann* (*Dann III*), 220 Ariz. 351, 362 ¶ 35, 207 P.3d 604, 615 (2009).

**¶14** A week after dismissing Juror 74, the court informed counsel that it wanted to bring her in for questioning in light of *State v. Anderson* (*Anderson I*), 197 Ariz. 314, 324 ¶ 23, 4 P.3d 369, 379 (2000). The court arranged a conference call with Juror 74. She was not under oath for the call, which occurred while she was in an Alabama airport between flights. When asked if she could set aside her feelings about the death penalty, she responded, "I cannot, I cannot participate in a process that allows the State to initiate death." She reiterated this view several times in response to questions from the court and counsel. She also affirmed that she planned to be out of town twice during trial to accompany her parents while they traveled. She had also accepted a job in Florida after being dismissed from the jury panel. Over Payne's objection, the court again dismissed Juror 74.

**¶15** A prospective juror who will automatically vote for or against the death penalty or will suffer a hardship may be removed for cause. A.R.S. § 21-202(B)(4)(c); *State v. Speer*, 221 Ariz. 449, 454-55 ¶ 23, 212 P.3d 787, 792-93 (2009). We find no error in the court's dismissal.

**¶16** Despite Juror 74's seemingly settled position on the death penalty and her travel plans, the trial court erred by failing to afford Payne an opportunity to rehabilitate her under oath. *See* Ariz. R. Crim. P. 18.5(d) (providing that upon request, the court "shall permit that party a reasonable time to conduct a further oral examination of the prospective

jurors"). Although defense counsel was able to ask rehabilitating questions during the telephonic conference, Juror 74 was not then under oath. Citing *Anderson I*, Payne argues that this constituted fundamental or structural error.

**¶17** But while *Anderson I* found the dismissal of jurors without adequate questioning to be structural error, the jurors there had expressed only equivocal objections to the death penalty and the defendant was not afforded any opportunity to rehabilitate them. 197 Ariz. at 319 ¶ 10, 324 ¶ 23, 4 P.3d at 374, 379. Here, in contrast, defense counsel was permitted to telephonically question the single juror who stated her unequivocal opposition to the death penalty.

**¶18** Juror 74's objections to the death penalty remained definite and unshakable, and her telephonic responses remained consistent with those on her questionnaire. That questionnaire states that the responses "have the effect of a statement given to the Court under oath." Given these circumstances, the error was not fundamental or structural, nor did it prejudice Payne.

### 3.  Juror 146

**¶19** Payne argues that the trial court erred by dismissing Juror 146 for cause based on her objections to the death penalty because, in response to another question, she indicated that she could follow the law. Juror 146's questionnaire indicated that she was personally, morally, or religiously opposed to the death penalty and would never vote for it under any circumstances. She also stated that she could not vote for a death sentence even if she felt it appropriate after hearing the evidence, instructions, and deliberating. Yet in response to other questions, she indicated that she would follow instructions and keep an open mind regarding aggravating and mitigating circumstances.

**¶20** After the process was explained, she said, "I cannot be responsible for putting a person to death even if they met [the] qualifications." When asked if she could vote to impose death if the law required, she said that she would follow instructions, but would not like it and would not "be okay with it emotionally." The judge noted that while

6

Juror 146 said she would follow the law, he was concerned about her ability to be fair. The court granted the State's motion to strike her for cause.

¶21 Although a "general objection to the death penalty is not sufficient to create a presumption that a prospective juror is unfit because of bias to sit on the panel," *Anderson I*, 197 Ariz. at 318 ¶ 6, 4 P.3d at 373 (discussing *Witherspoon v. Illinois*, 391 U.S. 510 (1968)), if a prospective juror's views would "prevent or substantially impair the performance of [her] duties," the court should strike the juror for cause, *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).

¶22 Juror 146's responses were sufficient to permit the judge to conclude that she could not be fair and impartial. *See State v. Glassel*, 211 Ariz. 33, 49-50 ¶¶ 53-55, 116 P.3d 1193, 1209-10 (2005) (affirming decision to strike a juror for cause who stated she could not make the decision to put someone to death despite her attestation that she would be "fair and impartial"). Therefore, the decision to dismiss Juror 146 was not an abuse of discretion.

### 4. Refusing to strike jurors

¶23 Payne claims that the trial court abused its discretion by refusing to strike Jurors 18, 28, 100, and 103, who were impaneled and deliberated, and Juror 94, who was designated an alternate. Although these jurors' questionnaires expressed pro-death penalty views or acknowledged media exposure or special feelings about child victims, the State rehabilitated them, with each stating that he or she would disregard personal feelings and follow the law and would not impose the death penalty if not appropriate. Thus, the trial judge did not abuse his discretion in refusing to strike these jurors.

### 5. Peremptory challenges

¶24 Payne claims that the trial court abused its discretion by refusing to strike Jurors 66, 71, 138, 152, and 153 for cause, requiring Payne to use peremptory challenges to remove them. Payne has failed to show that any of these jurors was so biased that it was an abuse of discretion to

7

deny his motions to strike. *See State v. Dickens*, 187 Ariz. 1, 11, 926 P.2d 468, 478 (1996) (defendant must show juror "was biased and could not reasonably render a fair or impartial verdict"), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239, 242-43 ¶¶ 15, 20, 274 P.3d 509, 512-13 (2012). The responses given by each juror provided the trial court a reasonable basis for concluding that each could remain impartial. Moreover, none of these jurors actually sat on the jury panel, making any error harmless. *See State v. Hickman*, 205 Ariz. 192, 198 ¶ 28, 68 P.3d 418, 424 (2003) (finding curative use of peremptory challenge subject to harmless error review).

### B. Venue

**¶25** Payne asserts that the trial court erred by denying his request for a change of venue based on presumed and actual prejudice.

#### 1. Presumed prejudice

**¶26** Payne first claims that the trial court erred by denying his request for a change of venue based on pre-trial publicity. We review a trial court's ruling on a motion for change of venue for an abuse of discretion. *State v. Cruz*, 218 Ariz. 149, 156 ¶ 12, 181 P.3d 196, 203 (2008).

**¶27** Approximately two months before the trial, Payne requested a change of venue based on adverse and excessive media coverage. He filed more than 200 newspaper and broadcast reports that mentioned his case. The trial court denied the motion, noting that much of the publicity criticized CPS and most articles about the facts had appeared long before trial. Payne did not renew his motion during trial.

**¶28** A defendant is entitled to change the venue for his trial "if a fair and impartial trial cannot be had." Ariz. R. Crim. P. 10.3(a). To show presumed prejudice, a defendant must show that the publicity "was so extensive or outrageous that it permeated the proceedings or created a carnival-like atmosphere." *State v. Blakley*, 204 Ariz. 429, 434 ¶ 14, 65 P.3d 77, 82 (2003) (internal quotation marks omitted) (quoting *State v. Atwood*, 171 Ariz. 576, 631, 832 P.2d 593, 648 (1992)). The publicity must be so prejudicial that the jurors could not decide the case fairly. *State v.*

*Nordstrom*, 200 Ariz. 229, 239 ¶ 15, 25 P.3d 717, 727 (2001), *abrogated on other grounds by Ferrero*, 229 Ariz. at 243 ¶ 20, 274 Ariz. at 513. We examine whether the publicity was chiefly factual and non-inflammatory and the amount of time between the coverage and trial. *See State v. Davolt*, 207 Ariz. 191, 206 ¶ 46, 84 P.3d 456, 471 (2004).

¶29 Media coverage of Payne's case was substantial. Several reports included prejudicial information, including Payne's criminal history, allegations that Payne victimized Gonzales, and graphic descriptions of Ariana's remains. Furthermore, several comments in internet news articles proclaimed Payne's guilt and advocated extra-judicial punishment. But most of the coverage appeared more than a year before trial, contained facts later substantiated by evidence at trial, and repeated a basic description of the crime that mirrored indictment allegations. *See Nordstrom*, 200 Ariz. at 240 ¶ 17, 25 P.3d at 728 (no presumed prejudice despite "troubling publicity" that appeared "many months before trial" where "much of the information" was "presented . . . as evidence" at trial). And the court exercised discretion and gave instructions to prevent potentially harmful coverage from infecting the venire.

¶30 Payne has failed to meet the "'very heavy' burden" of proof necessary to show presumed prejudice. *Cruz*, 218 Ariz. at 157 ¶¶ 17, 20, 181 P.3d at 204.

2. Actual prejudice

¶31 Payne alternatively claims that even if prejudice is not presumed, he has shown actual prejudice. Actual prejudice is established by showing that sitting jurors "formed preconceived notions concerning the defendant's guilt." *State v. Chaney*, 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (1984). Mere knowledge of or opinions about the case do not disqualify a juror who can set them aside and decide based on the evidence presented at trial. *Cruz*, 218 Ariz. at 156-57 ¶ 14, 181 P.3d at 203-04. Payne has not shown actual prejudice among the sitting jurors.

¶32 Of the twelve jurors who deliberated, seven reported exposure to media reports. Five of the seven reported "very little"

exposure, and all seven assured the court they could disregard it. *See Atwood*, 171 Ariz. at 632, 832 P.2d at 649 (no prejudice where half of jurors had "minimal" media exposure, but indicated it would not interfere), *disapproved of on other grounds by Nordstrom*, 200 Ariz. at 241 ¶ 25, 25 P.3d at 729. Throughout voir dire and after the jury was sworn, the trial court admonished the jury to avoid coverage and report any exposure.

**¶33**    Payne attempts to show that events at trial tainted the objectivity of the jurors. He highlights several allegedly prejudicial events: a spectator's statement, which occurred in a hallway with no jurors present, that Payne was a "monster" who should "fry"; a cameraman's utterance of "what the f***" in response to a camera problem, an utterance heard only by Payne's counsel and a deputy; and blogging by two witnesses during the trial, mostly discussing the victims' mother. Payne fails to connect these isolated events to actual prejudice or bias of any jury member.

**¶34**    Finally, Payne argues that actual prejudice was shown by the court's directive to jurors that they remain on one floor to avoid the media and witnesses. Such admonitions, however, are precisely the type of prophylactic measures courts should take to avoid tainting the jury. *See Nordstrom*, 200 Ariz. at 240 ¶¶ 18-19, 25 P.3d at 728 (finding insufficient evidence of actual prejudice to justify a change of venue and noting admonition to jurors to avoid media exposure). Thus, Payne has failed to show actual prejudice.

### C.    Post-Arrest Statements

**¶35**    Payne argues that the trial court erred by refusing to suppress his post-arrest statements, which he claims violated *Miranda* and were involuntary. We review rulings admitting a defendant's statements for an abuse of discretion. *State v. Newell*, 212 Ariz. 389, 396 ¶ 22 & n.6, 132 P.3d 833, 840 & n.6 (2006).

**¶36**    When the police officers first encountered Payne at a motel, they told him they were investigating a crime and asked if he would accompany them to the station to answer questions. Payne refused to go without his lawyer. The police then arrested him on an unrelated

misdemeanor warrant. Once at the station, they put Payne in an interrogation room. He waited approximately thirty minutes, during which time he yelled, banged his handcuffs on the table, kicked the wall, and asked to use the restroom, which he was allowed to do. In response to the noise, Detective Walker opened the door to check on Payne. He did not intend to interrogate Payne then, but Payne insisted that questioning begin immediately. So Detective Walker read Payne his *Miranda* rights, which Payne waived. Eventually, Payne admitted that the victims died in his care and that he concealed their bodies in the storage facility.

1.      Right to counsel

¶37      Payne claims that he clearly and unambiguously invoked his right to counsel when police first encountered him outside of the motel. Citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), he asserts that once a suspect in custody invokes his *Miranda* right to counsel, police may not interrogate him until he has counsel or he reinitiates the contact.

¶38      Assuming that Payne did request counsel outside the motel, the question arises whether his invocation was effective. *Miranda* rights generally cannot be invoked unless the suspect is in police custody. *See McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991). In *McNeil*, the Court noted that it had "in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'" *Id.* Although Arizona courts have never had occasion to address the issue, other jurisdictions have relied on this language from *McNeil* to conclude that a non-custodial, anticipatory invocation of rights is not effective. *See, e.g.*, *United States v. LaGrone*, 43 F.3d 332, 339 (7th Cir. 1994); *Alston v. Redman,* 34 F.3d 1237, 1249 (3d Cir. 1994); *United States v. Wright*, 962 F.2d 953, 955 (9th Cir. 1992) ("The [Supreme] Court has never held that *Miranda* rights may be invoked anticipatorily outside the context of custodial interrogation; we see no reason, apart from those already rejected in *McNeil*, to do so here."). We reach a similar conclusion.

¶39      Payne was not in custody when he attempted to invoke his right to counsel because, other than the presence of police, he had no reason to "feel deprived of his freedom of action." *See State v. Stanley*, 167 Ariz. 519, 523, 809 P.2d 944, 948 (1991); *see also State v. Carter*, 145 Ariz. 101,

105-06, 700 P.2d 488, 492-93 (1985) (inherently coercive nature of speaking to police is insufficient). The police had not indicated that he was suspected of committing a crime, had not told him he was under arrest, and had not drawn their guns. Moreover, Payne felt free to refuse to accompany them. Thus, Payne's initial invocation was ineffective.

### 2. Right to silence

**¶40** Payne also claims that he invoked his right to silence during the interrogation. An invocation of the right to silence must be unequivocal and unambiguous, as judged from the perspective of a reasonable officer under the totality of the circumstances. *State v. Cota*, 229 Ariz. 136, 144-45 ¶ 26, 272 P.3d 1027, 1035-36 (2012). If an invocation is ambiguous or equivocal, "the police are not required to end the interrogation . . . or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259-60 (2010). During the interrogation, the following exchange occurred:

> PAYNE: . . . you know what man, I don't wanna talk anymore[.] [C]an I call my father[;] can I get my one phone call?
>
> WALKER: Your father is still in [a] plane.
>
> PAYNE: Well let me call my sister, and then my step-sister, just to let them know that, what the f*** is goin' on, and then I'll talk, man. I don't know what the f*** you wanna get outta me, but I'll talk.

**¶41** A reasonable officer in these circumstances could find Payne's request ambiguous or equivocal because he indicated that he would talk after he spoke with a family member. Therefore, the trial court did not abuse its discretion in finding no violation of *Miranda* and admitting Payne's statements.

### 3. Voluntariness

**¶42** Payne argues that his statements were involuntary because he relied on promises made by the police and was suffering from heroin withdrawal when he confessed. Trial courts presume confessions to be involuntary, *State v. Ross*, 180 Ariz. 598, 603, 886 P.2d 1354, 1359 (1994), but we review a trial court's ruling on a motion to suppress for an abuse of discretion, *State v. Hausner*, 230 Ariz. 60, 70 ¶ 23, 280 P.3d 604, 614 (2012).

**¶43** The effect of withdrawal from drugs does not render a confession involuntary unless the suspect "is unable to understand the meaning of his statements" or cannot reason or comprehend what is happening. *State v. Laffoon*, 125 Ariz. 484, 487, 610 P.2d 1045, 1048 (1980) (citing *State v. Arredondo*, 111 Ariz. 141, 145, 526 P.2d 163, 167 (1974)). Payne reported being cold and sick, asked for methadone, and vomited at the end of the interrogation. EMTs evaluated Payne, however, and concluded that his vital signs were normal. He clearly understood and followed the questioning, consistently denied police assertions, and presented facts in a light favorable to himself.

**¶44** Payne also argues that he confessed because police said they would let him speak with Gonzales. *See State v. Ellison*, 213 Ariz. 116, 127 ¶ 30, 140 P.3d 899, 910 (2006) (noting that promises and coercion may render statements involuntary). Courts examine the totality of the circumstances to determine whether the suspect's will was overborne by police conduct. *Stanley*, 167 Ariz. at 523-24, 809 P.2d at 948-49. Although police did tell Payne he could talk with Gonzales, he did not show that this was a promise or quid pro quo for talking, that he relied upon the statement, or that the police overbore his will. The circumstances indicate otherwise: Payne made his admissions at times far removed from any promises regarding Gonzales, and after Payne's initial incriminatory statements, Payne denied disposing of Tyler's body in a different location, denied abusing the children, and denied murdering the children to avoid paying child support. *See Newell*, 212 Ariz. at 400 ¶ 50, 132 P.3d at 844 (noting that continued denials were evidence that defendant's will was not overborne).

13

¶45 For these reasons, we conclude that the trial court did not abuse its discretion by finding that Payne's statements were voluntary.

## D. Exclusion of Hearsay

¶46 Payne contends that the trial court erroneously prevented him from presenting evidence regarding Gonzales's threats to "kill" the children if he did not do something about their behavior. The statements he wished to introduce were: "You got to do something about these f***ing kids. You got to shut these f***ing kids up or I'm going to f***ing kill them." Payne sought to introduce these statements through the testimony of Debra Reyes, who sold heroin with Payne and overheard phone calls in which Gonzales screamed at Payne and threatened to kill the children.

¶47 The State moved to preclude these statements on hearsay grounds and because they would open the door to testimony that Gonzales wanted to help the children but feared reprisals from Payne. At Payne's request, the court had previously precluded evidence about threats and domestic abuse between Payne and Gonzales.

¶48 Payne argues that Gonzales's statements qualify as present sense impressions under Arizona Rule of Evidence 803(1) and excited utterances under Rule 803(2). Payne asserts for the first time that they also qualify as party admissions under Rule 801(d)(2), statements of existing mental, emotional, or physical condition under Rule 803(3), and statements against interest under Rule 804(b)(3). The court precluded the statements "on the basis of the record," ruling that Payne could call Gonzales and Reyes, but could not ask Reyes about Gonzales's threats to kill the children.

¶49 Out of court statements offered to prove the truth of the matter asserted are hearsay and are inadmissible unless they fall within an exception to the hearsay rule. Ariz. R. Evid. 801(c)-(d), 802. We review the rulings on those grounds that Payne raised at trial for an abuse of discretion, *State v. Chappell*, 225 Ariz. 229, 238 ¶ 28, 236 P.3d 1176, 1185 (2010), and review de novo constitutional issues and the meaning of the rules of evidence, *State v. Hansen*, 215 Ariz. 287, 289 ¶ 6, 160 P.3d 166, 168

(2007). We review those issues that Payne did not raise at trial for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

**¶50** To qualify as a present sense impression under Rule 803(1), a statement must "describ[e] or explain[] an event or condition" while the viewer is perceiving it or immediately thereafter. Payne argues that Reyes was perceiving Gonzales's frustration with the children. But the statement at issue — Gonzales's threat to kill the children — was not the sense impression. Nor did the statement qualify as an excited utterance under Rule 803(2). That rule requires that the statement "relate[] to a startling event or condition." The trial court did not abuse its discretion by finding that the statement did not qualify as an excited utterance because no startling event or condition had occurred.

**¶51** Under Rule 801(d)(1)(A), a statement is not hearsay if the "declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is inconsistent with the declarant's testimony." Gonzales testified at trial, and Payne made an offer of proof in which Gonzales denied making the statements. Reyes's testimony about Gonzales's prior statement qualified under this rule.

**¶52** But trial courts have discretion to exclude otherwise admissible evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Ariz. R. Evid. 403. Introducing Gonzales's statements through Reyes would have raised collateral issues, such as whether the threats actually evidenced any intent to harm the children, and implicated even more peripheral issues such as Gonzales's fear of Payne and evidence of past abusive incidents between Payne and Gonzales. The trial court had previously granted Payne's motion to preclude evidence of any abuse of Gonzales. The trial court acted within its discretion in precluding the admission of Gonzales's statements through Reyes because they might have caused confusion and wasted time. Moreover, other evidence presented at trial amply showed Gonzales's exasperation with the children, including Gonzales's testimony that she often called Payne to yell about the children and Reyes's testimony about witnessing similar

frustrations.  Furthermore, the jury knew that Gonzales was incarcerated for her involvement in the murders.  Therefore, the precluded testimony was cumulative, and for this additional reason, the trial court did not abuse its discretion by excluding it.

¶53        Furthermore, the record contained substantial evidence that the children were malnourished, abused, kept in a closet, and ultimately died in Payne's care.  Even if the jury had heard and believed that Gonzales threatened to kill the children, there was ample evidence that Payne abused and premeditatedly murdered them by failing to help them.

¶54        Because we find no abuse of discretion in excluding Reyes's testimony regarding Gonzales's statements, we do not address the hearsay exceptions not raised at trial, which would be subject to fundamental error review.

¶55        Payne also contends that excluding this testimony violated his constitutional rights to due process and compulsory process.  But the analysis for these claims parallels our Rule 403 analysis, focusing on the probative value and prejudicial effect of the evidence.  *See United States v. Cruz-Escoto*, 476 F.3d 1081, 1088 (9th Cir. 2007).  As such, the exclusion of this evidence did not violate due process or compulsory process rights.

### E.        Admission of Evidence of Heroin Sales

¶56        Payne asserts that the trial court inappropriately admitted evidence that he sold heroin.  He claims that this was unduly prejudicial because it encouraged the jury to convict him for uncharged bad acts.  We review the admission of evidence for abuse of discretion.  *State v. Robinson*, 165 Ariz. 51, 56, 796 P.2d 853, 858 (1990).

¶57        The court found the nature of Payne's job required that he remain away from home for long hours.  This motivated him to lock his children in the closet to appease Gonzales.  Thus the court found the evidence probative of motive.  To attempt to minimize prejudice, the court admonished the State "to limit the number of times . . . the issue [was] brought up, and not use racy words."  The State mentioned in its opening statement and closing argument that Payne "started dealing drugs" and

16

was "working with" a heroin dealer. Payne himself also mentioned several times in his opening statement and closing argument that he sold heroin. In its final instructions, the court instructed the jury not to consider evidence of drug use or sales for character purposes or as a basis for determining that the defendant committed the charged offenses.

¶58 Evidence of uncharged acts may not be admitted to prove bad character or that, because a defendant did one bad act, he likely engaged in other bad acts. Ariz. R. Evid. 404(b). But such evidence may be admitted to prove other issues, such as motive, opportunity, or lack of mistake or accident. *Id.*; *see Ferrero*, 229 Ariz. at 241 ¶ 5, 274 P.3d at 511. When other act evidence is admissible but prejudicial, the trial court must "limit the evidence to its probative essence (motive) by excluding irrelevant or inflammatory detail." *State v. Hughes*, 189 Ariz. 62, 70, 938 P.2d 457, 465 (1997).

¶59 The trial court did attempt to limit the prejudice here and did not abuse its discretion. Each time the State mentioned the heroin sales, it did so to explain why Payne was away from home for long periods.[3] The evidence was relevant to the State's theory that Payne locked the children in the closet so he could stay away from home without interruption from Gonzales's calls.

¶60 Finally, the trial court did find that the probative value of the evidence was not substantially outweighed by its prejudicial effect. The jury heard evidence that Gonzales and Payne used heroin, marginalizing any prejudicial effect from evidence that Payne was absent because he was out selling it.

---

[3] Prosecutors and courts should tread carefully in areas that may affect the fairness of a criminal trial. A defendant might also spend long hours away from home while working as a lawyer or stockbroker. For that reason, trial judges should carefully scrutinize requests to admit prejudicial evidence. In this case, we cannot say that the judge's ruling was an *abuse* of discretion, but the issue is close. The judge's limiting instructions helped prevent an abuse.

### F.      Jurors Seeing Payne in Restraints

**¶61**          Relying on *Deck v. Missouri*'s holding that routine use of visible shackles on a defendant is "inherently prejudicial," *see* 544 U.S. 622, 628 (2005), Payne contends that the trial court erred by denying his motion for a mistrial or to designate jurors as alternates after they saw Payne in restraints outside the courtroom.  Mistrial is an extraordinary remedy for trial error "and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted."  *Speer*, 221 Ariz. at 462 ¶ 72, 212 P.3d at 800 (quoting *Dann I*, 205 Ariz. at 570 ¶ 43, 74 P.3d at 244).  We review the trial court's rulings for abuse of discretion. *State v. Adamson*, 136 Ariz. 250, 260, 665 P.2d 972, 982 (1983) (mistrial); *State v. Bible*, 175 Ariz. 549, 574, 858 P.2d 1152, 1177 (1993) (designation of jurors).

**¶62**          During trial, Juror E told the court that, while in a restricted-access hallway, he saw Payne in an elevator with three officers and a "cage."  The jurors had been wondering what the elevator was used for, so Juror E told Juror F that the elevator was used to transport "prisoners." Upon questioning, Juror E assured the court that the incident would not affect his ability to remain fair and impartial.  Juror F gave similar assurances.  The court denied Payne's motion for a mistrial or to designate Jurors E and F as alternate jurors, noting that jurors would not be "surprise[d]" to know that Payne was in custody, in part because they were to see a video of him wearing restraints the next trial day.

**¶63**          Several days later, another juror, Juror W, passed the same elevator when Payne and deputies were inside and the doors were open. When the trial court asked Juror W whether he saw anything he was not supposed to see, Juror W said he did not think so.  The court did not question him further because it did not want to suggest an answer.  Payne renewed his motions, which the court again denied.  The court nonetheless admonished the deputies to exercise more caution when transporting Payne.  Before the court selected alternates, Payne renewed his motion to designate Jurors E, F, and W as alternates, but the court again denied the motion.

**¶64**          A third incident occurred when the deputies opened the

door of the elevator as two jurors walked by. Juror N1 was dismissed randomly as an alternate. The deputies believed that the other juror, Juror N2, was not looking in their direction, but even if so, would not have seen Payne's shackles because Payne was standing behind the officers. Payne pointed out that he was taller than the deputies and so could easily have been seen. The trial court declined to designate Juror N2 an alternate, noting that Payne was not "wear[ing] shackles on his head."

¶65 Payne relies on cases holding that routine use of visible shackles is "inherently prejudicial" and obviates the need for a showing of prejudice. *See Deck*, 544 U.S. at 635. But brief, inadvertent juror exposure to the defendant in shackles outside the courtroom does not rise to the same level. *See Speer*, 221 Ariz. at 462-63 ¶ 74, 212 P.3d at 800-01. Payne must therefore show actual prejudice, *see id.* ¶ 72, which the record does not reflect.

¶66 During voir dire by Payne, Jurors E and F, who deliberated after seeing Payne in restraints, assured the court that the incident would not affect their ability to be fair and impartial. Their "brief and inadvertent exposure" outside the courtroom was not inherently prejudicial. *See State v. Apelt*, 176 Ariz. 349, 361, 861 P.2d 634, 646 (1993) (affirming denial of new trial where four jurors saw defendant in shackles and handcuffs being escorted from courthouse). Payne has not pointed to any evidence that jurors were prejudiced. And, as the trial court observed, it is highly unlikely that any juror would have been surprised that Payne was in custody. Thus, Payne has not established actual prejudice.

### G. Child Abuse Charges

¶67 Payne makes four claims related to his child abuse convictions, which are addressed in turn below.

#### 1. Mens rea of "circumstances"

¶68 Payne asserts that the trial court erroneously prohibited him from arguing to the jury that the State must prove that he abused the children "under circumstances [that he intended or knew were] likely to

cause death or serious physical injury." This, he claims, turned child abuse into a strict liability offense and, as a result, the court erred in instructing the jury on the elements of child abuse. We review de novo statutory interpretation issues, *State v. Armstrong* (*Armstrong III*), 218 Ariz. 451, 463 ¶ 54, 189 P.3d 378, 390 (2008), and whether jury instructions properly state the law, *State v. Johnson*, 212 Ariz. 425, 431 ¶ 15, 133 P.3d 735, 741 (2006).

¶**69** Section 13-3623(A) makes it crime, "[u]nder circumstances likely to produce death or serious injury," for a person to cause physical injury to a child or to permit the injury of a child in the person's care or custody. This offense is a class 2 felony "[i]f done intentionally or knowingly." *Id.* § 13-3623(A)(1). Payne contends that, in order to convict him of child abuse as a class 2 felony, in addition to showing that he intended to cause or knew that he would cause (or permit) injury, the State had to show that he intended or knew that the "circumstances were likely to produce death or serious injury." Payne thus contends that the intentional or knowing mens rea requirement applicable to the other elements of child abuse also applies to the circumstances component. The trial court rejected Payne's construction and instructed the jury that the State must prove "that the defendant committed child abuse in at least one of the three possible manners . . . , and that [his actions occurred] under circumstances likely to cause death or serious physical injury" to the children.

¶**70** If a statute requires a mental state, it applies to each element of the offense unless it "plainly appears" that the legislature intended otherwise. A.R.S. § 13-202(A). The questioned portion of § 13-3623(A) (the "circumstances clause") provides that abuse must occur "[u]nder circumstances likely to produce death or serious physical injury." We have not addressed whether any mens rea requirement applies to this phrase, but our court of appeals has upheld convictions based solely on objective evidence of the existence of such circumstances, without requiring the state to prove the defendant's intent that the circumstances be such that death or serious injury might occur. *See State v. Johnson*, 181 Ariz. 346, 350, 890 P.2d 641, 645 (App. 1995); *State v. Greene*, 168 Ariz. 104, 105-06, 811 P.2d 356, 357-58 (App. 1991). Other jurisdictions have similarly interpreted such clauses. *See People v. Sargent*, 970 P.2d 409, 418

(Cal. 1999) (California's circumstances clause "does not provide that a defendant must 'know or reasonably should know that his or her actions occur under circumstances or conditions likely to produce great bodily harm or death.'" (quoting Cal. Penal Code § 273a)); *cf. Williams v. State*, 641 A.2d 990, 992-93 (Md. Ct. Spec. App. 1994) (whether circumstances in reckless endangerment are likely to result in serious physical injury or death is an objective inquiry). "[C]ircumstances likely to produce death or serious physical injury," unlike the abuse itself, either exist or do not exist. This Court has similarly found the "care and custody" element of § 13-3623(A) to be an objective factual inquiry rather than an element for which mens rea must be proven. *See State v. Jones*, 188 Ariz. 388, 393-94, 937 P.2d 310, 315-16 (1997).

**¶71** Moreover, the statute increases the offense level based on the actor's intent: If the offense is "done intentionally or knowingly," it becomes a class 2 felony. A.R.S. § 13-3623(A)(1). It is a lesser offense if done negligently or recklessly. *See id.* § (A)(2). The structure of the statute thus suggests that the mens rea refers to the act that the defendant "does," and not to the background circumstances. Because we find that the circumstances clause is more like the "care and custody" provision, we decline to apply the means rea to the circumstances clause.

**¶72** Payne argues that such an interpretation turns child abuse into a strict liability crime. But a statute creates a strict liability crime only if it does not require *any* mental state. *Williams*, 144 Ariz. at 488, 698 P.2d at 733. That is not the case here, as § 13-3623(A) requires at least criminal negligence for the act itself, and the section under which Payne was charged, § 13-3623(A)(1), requires knowledge or intent.

**¶73** Finally, Payne claims that because the circumstances clause is an element of the crime that enhances punishment and appears in the text defining the offense, the legislature must have intended for it to have a mens rea requirement. We disagree. It is the level of intent that enhances the offense level, not the existence of "circumstances." *See* A.R.S. § 13-3623(A). As such, the court's instructions were correct.

2.     <u>Count 2: insufficiency of evidence of Ariana's broken bones</u>

**¶74**     Payne argues that the State presented insufficient evidence to prove that he "knowingly or intentionally . . . caus[ed] or permitt[ed] [Ariana's] bones to be broken under circumstances likely to cause serious injury or death." He argues that broken bones are not themselves serious physical injuries, but rather, quoting *State v. George*, 206 Ariz. 436, 441 ¶ 9, 79 P.3d 1055, 1062 (App. 2003), asserts that the injuries must be "more than the usual temporary impairment caused by the fracture of a body part." Therefore, he claims that the State failed to show that Ariana's broken bones occurred in circumstances likely to result in serious injury or death.

**¶75**     Payne's argument rests on the assumption that, to prove a violation of § 13-3623(A)(1), the State had to prove that broken bones are serious injuries or that breaking bones or permitting bones to be broken caused serious physical injury or death to Ariana. That is not the case. Instead, the State had to prove only that Payne caused or permitted abuse or injuries — here, broken bones — to occur in *circumstances* likely to cause serious injury or death. In § 13-3623(A), "serious physical injury" is used only to describe circumstances that must exist when the abuse occurs. *See Johnson*, 181 Ariz. at 350, 890 P.2d at 645 (interpreting "likely" as "probable," upholding conviction under § 13-3623(A)(1) based on circumstances that may cause serious injury, rather than actual serious injury); *State v. Styers*, 177 Ariz. 104, 110, 865 P.2d 765, 771 (1993) (noting that a "person commits child abuse if 'under circumstances likely to produce death or serious physical injury,' he causes a child to suffer physical injury or abuse").

**¶76**     Payne secondarily asserts that the State presented insufficient evidence to show that he intentionally or knowingly broke Ariana's bones or permitted them to be broken while she was in his care because the breakages could have occurred before he started caring for her or after her death. We review the sufficiency of evidence to determine whether "substantial evidence exists to support the jury verdict." *State v. Stroud*, 209 Ariz. 410, 411 ¶ 6, 103 P.3d 912, 913 (2005). Substantial evidence is proof, viewed in the light most favorable to sustaining the

verdict, that would allow reasonable persons to find a defendant guilty beyond a reasonable doubt. *State v. Bearup*, 221 Ariz. 163, 167 ¶ 16, 211 P.3d 684, 688 (2009); *see State v. Roque*, 213 Ariz. 193, 218 ¶ 93, 141 P.3d 368, 393 (2006) (viewing facts favorably).

¶77 Substantial evidence shows that Payne broke or permitted bones to be broken. Evidence was presented that the children were seen outside, playing and seemingly well, when they first came to stay with Payne. At trial, three experts testified that Ariana's bones, given their differing states of healing, had likely been broken when Ariana was in Payne's care, although the experts could not establish the precise time of any injury. Moreover, Gonzales testified that Payne stated that he did not seek help for the children because he feared being arrested for abuse. This Court has found knowledge or intent where the defendant knew that the victim needed medical attention, but chose not to act. *See State v. Mott*, 187 Ariz. 536, 543, 931 P.2d 1046, 1053 (1997); *see also State v. Poehnelt*, 150 Ariz. 136, 141, 722 P.2d 304, 309 (App. 1985) (upholding child abuse conviction, relying partly on victim's malnourishment).[4]

¶78 Sufficient evidence was also presented that the circumstances existing when the abuse occurred were likely to cause serious injury or death. Ariana's multiple and serious injuries occurred while she was being punished by being locked in the closet and not being fed or cared for. This evidence is sufficient to support the jury's finding that the injuries occurred under circumstances likely to cause serious injury or death.

---

[4] Because sufficient evidence supports the conviction for Count 2, we do not address Payne's argument that his conviction for felony murder must be overturned because it would be unclear whether the jury was unanimous on felony murder if the evidence did not support Count 2. Moreover, the jury unanimously found felony murder as to Tyler based upon its finding of guilt on Count 6, suggesting that it would have similarly unanimously found felony murder as to Ariana based solely upon Payne's conviction on Count 3, discussed below.

### 3. Potential for non-unanimous verdicts

**¶79** Payne next argues that he was deprived of a unanimous verdict regarding the child abuse charges because the jury was not required to agree on which act caused each type of abuse.

**¶80** The State charged Payne with three counts of child abuse. Count 2 charged Payne with knowingly or intentionally causing or permitting Ariana's bones to be broken under circumstances likely to cause death or serious physical injury. Count 3 alleged that Payne knowingly or intentionally caused or permitted Ariana's health to be endangered under circumstances likely to cause death or serious physical injury by failing to seek medical attention for Ariana or allowing her to starve to death. Count 6 alleged the same as Count 3 with respect to Tyler. Payne did not seek clarification of the indictment or object to any count in the indictment on grounds that the indictment itself was duplicitous, but did argue, after the close of the evidence, that the State should have been required to specify which act it relied upon to prove each count because permitting evidence of multiple acts to satisfy a single charge presented duplicity issues. Because the objection came too late to permit correction of the alleged defects, we review for fundamental error. *See Dann III*, 220 Ariz. at 367 ¶ 76, 207 P.3d at 620.

**¶81** A criminal defendant is entitled to a unanimous verdict. *Id.* at 367 ¶ 79, 207 P.3d at 620 (quoting Ariz. Const. art. 2, § 23). If an indictment is facially valid, but the state introduces evidence of several acts, each of which might satisfy the charge, the risk of a non-unanimous verdict is presented. *See State v. Davis*, 206 Ariz. 377, 390 ¶ 61, 79 P.3d 64, 77 (2003). As we observed in *Dann III*, however, as long as only one charge is alleged in a count of an indictment, jurors may "reach a verdict based on a combination of alternative findings." 220 Ariz. at 367 ¶ 79, 207 P.3d at 620; *cf. State v. Gomez*, 211 Ariz. 494, 498 ¶ 16 n.3, 123 P.3d 1131, 1135 n.3 (2005) (noting that a "jury need not be unanimous as to the theory of first degree murder as long as all agree that the murder was committed"); *State v. Tucker*, 205 Ariz. 157, 166-67 ¶¶ 48-51, 68 P.3d 110, 119-20 (2003) (to same effect).

*a.     Count 2*

**¶82**         Count 2 charged Payne with knowingly or intentionally causing or permitting Ariana's bones to be broken in circumstances likely to cause death or physical injury.  Payne argues that Count 2 was duplicitous as presented at trial because it permitted the jury to find him guilty if he either broke Ariana's bones or permitted someone else to break them.

**¶83**         We disagree that this rendered the charge duplicitous. Count 2 did not charge multiple crimes in a single count; rather it charged a single crime — abusing Ariana by breaking her bones or permitting them to be broken — that could be committed in multiple ways.

**¶84**         Payne argues that Count 2 nonetheless subjected him to the danger of a non-unanimous verdict by allowing jurors to find him guilty despite potential disagreement regarding his responsibility for individual acts.  But Payne was aware of the existence of multiple fractures and yet did not request that the State be required to elect one to rely upon until after evidence had closed.

**¶85**         Indictments need not specify the precise act constituting the crime if "there is no reasonable basis" for distinguishing multiple acts. *State v. Klokic*, 219 Ariz. 241, 246 ¶ 25, 196 P.3d 844, 849 (2008).  In such a case, "the defendant is not entitled to a unanimous verdict on the precise manner" in which an act is committed.  *State v. Encinas*, 132 Ariz. 493, 496, 647 P.2d 624, 627 (1982); *see also State v. Counterman*, 8 Ariz. App. 526, 531-32, 448 P.2d 96, 101-02 (1968) (upholding assault conviction where two assaults occurring as part of a continuous course of conduct were charged in one count).  Thus, the jury here was not required to unanimously agree on the manner of committing child abuse.

**¶86**         Payne was charged with a count of child abuse by causing or permitting bones to be broken.  This is a discrete method of committing child abuse under § 13-3623(A).  Payne had notice of the charge and defended against all acts by claiming that he did not break or permit breakage of any bones.  The charge and acts constituting it were sufficiently specific that he could later assert double jeopardy.  *See State v.*

*Ramsey*, 211 Ariz. 529, 533-34 ¶ 9, 124 P.3d 756, 760-61 (App. 2005).

¶87            Count 2 was thus not duplicitous.

### b.      Counts 3 and 6

¶88            Counts 3 and 6 alleged that Payne caused or permitted Ariana and Tyler's health to be endangered by failing to seek medical attention for them or allowing them to starve to death.  Payne argues that those counts were duplicitous because he could be found guilty based on two separate acts:  failing to seek medical attention "and/or" starving the children to death.

¶89            Payne argues that failing to feed and failing to seek medical attention are separate acts that should have been charged separately because one is active and one is passive, citing *State v. Leal*, 723 P.2d 977 (N.M. App. 1986).  We find this unpersuasive because both involve the failure to do something and are thus passive.

¶90            Moreover, each count of the indictment charges only one crime of child abuse, essentially by neglect.  Thus, even if the jury believed Payne's argument that he tried to feed the children but they did not wish to eat or were not able to eat, his failure to seek medical attention also constituted abuse under the statute.  Payne admitted to police that he did not seek medical care for the children because he was afraid he would be charged with child abuse, and he presented no evidence or argument at trial that he attempted to seek such help.  Because he was not entitled to a unanimous verdict on the manner in which the act was performed, *Encinas*, 132 Ariz. at 496, 647 P.2d at 627, Counts 3 and 6 were not duplicitous.  Even if an error did occur, Payne was not prejudiced — the failure to seek medical care itself satisfied the charge, and no reasonable jury could have found that Payne was not guilty of child abuse under this theory.

### 4.      Jury instructions and verdict forms

¶91            Payne argues that the trial court erred by instructing on the child abuse theory of causing physical injury because the State did not

26

allege that type of abuse. At the close of evidence in the guilt phase, over Payne's objection, the trial court combined the instructions for all three counts of child abuse:

> The crime of intentional or knowing child abuse requires proof that, under circumstance[s] likely to produce death or serious physical injury, the defendant did one of the following:
>
> One, intentionally or knowingly causing the child to suffer physical injury; or
>
> Two, having the care or custody of a child[,] intentionally or knowingly causes or permits the person or health of the child to be injured; or
>
> Three, having the care or custody of a child[,] intentionally or knowingly causes or permits the child to be placed in a situation where the person or health of the child is in danger.
>
> In order to determine that the defendant committed the crime of intentional or knowing child abuse[,] it is not necessary that all 12 of you agree on the particular manner in which the crime was committed. However, it is necessary that each of you determine that the defendant committed child abuse in at least one of the three possible manners set forth above, and that it was under circumstances likely to cause death or serious physical injury.

When explaining the verdict forms, the court also combined all three methods of child abuse in each count. For example, the verdict form for the child abuse counts for breaking Ariana's bones included all three methods of committing child abuse under the statute, even though the indictment only alleged the "cause or permit the person or health of the child to be injured" variation. The jury found Payne guilty of all three counts.

¶92 But the instructions here were followed by verdict forms

specifying the allegations satisfying each count. Because these forms properly instructed the jury on the required findings, the jurors were not misled and there was no reversible error.

### H. Sufficiency of Evidence for First Degree Murder

¶93 Payne argues that the evidence was insufficient to prove that he murdered his children with premeditation. We review the sufficiency of evidence to determine whether "substantial evidence exists to support the jury verdict," viewing the facts in the light most favorable to sustaining the verdict. *Stroud*, 209 Ariz. at 411 ¶ 6, 103 P.3d at 913.

¶94 A person commits first degree premeditated murder if, "[i]ntending or knowing that the person's conduct will cause death, the person causes the death of another person . . . with premeditation." A.R.S. § 13-1105(A)(1). "'Premeditation' means that the defendant acts with either the intention or knowledge that he will kill another human being, when such intention or knowledge precedes the killing by any length of time to permit reflection." *State v. Thompson*, 204 Ariz. 471, 475 ¶ 12, 65 P.3d 420, 424 (2003) (quoting A.R.S. § 13-1101(1)).

¶95 Sufficient evidence in this case supports the jury's finding that Payne intentionally abused his children and later decided to take their lives. Gonzales testified that while Ariana and Tyler were initially placed in the closet only while Payne was away from home and for disciplinary purposes, after about a month, Payne left them in the closet permanently, feeding them irregularly, then not at all. They died soon after. Thus, it was reasonable for jurors to infer that Payne's intentions changed. Therefore, there was sufficient evidence to support the jury's finding of premeditated murder.

### I. Juror Question During Deliberations

¶96 During deliberations in the guilt phase, the jury sent the judge a note asking whether there was an "advantage to having a unanimous decision on guilt" on both felony murder and premeditated murder theories. Payne argues that the trial court committed reversible error by not granting his mistrial motion following this question, asserting

that it suggested that the jurors had viewed extraneous information. We review a trial court's rulings on motions for mistrial based on juror misconduct for abuse of discretion. *Cruz*, 218 Ariz. at 163 ¶ 67-68, 181 P.3d at 210.

¶97          After the question was relayed to the judge, Payne was consulted and asked the court to instruct the jurors to resolve that question themselves. The court adopted part of Payne's requested instruction, telling the jurors to resolve the question themselves, "based upon the instructions, evidence, and arguments you have heard and received." Before so instructing the jury, the court asked whether the defense objected. The defense responded "no." The next day, Payne moved for a mistrial, arguing that the question showed that the jury considered extra-judicial information because it suggested that the jurors were split on the theory and traded votes to ensure a "solid" conviction. The trial court denied the motion.

¶98          Payne does not point to any indication, apart from the question itself, that the jurors received extraneous information or that any other misconduct occurred. Our cases ordering a new trial have focused on stronger reasons to believe that jurors received extrinsic evidence. *See, e.g.*, *State v. Glover*, 159 Ariz. 291, 293, 295, 767 P.2d 12, 14, 16 (1988) (jury foreman submitted affidavit and testified that two jurors consulted outside sources and shared information); *State v. McLoughlin*, 133 Ariz. 458, 460-61, 652 P.2d 531, 533-34 (1982) (during deliberations "one juror was told by an unidentified third party that if appellant was found not guilty by reason of insanity, he would go free").

¶99          Nor did the trial court err in responding to the jury's question. The court consulted both parties and both agreed to the proposed response. Payne further argues that the instruction to consider evidence "received" did not explicitly limit the jurors to considering only evidence admitted. We do not believe a reasonable juror would have inferred any distinction between "received" and "admitted" in this context. The trial court did not abuse its discretion.

### J.    Juror Bias

**¶100**        Payne argues that the trial court abused its discretion by denying his motion to strike Juror 28 for bias or, in the alternative, to designate her as an alternate.  "The trial court, which has the opportunity to observe the prospective juror's demeanor and the tenor of his answers, is in a position to determine first hand whether a juror can render a fair and impartial verdict."  *Chaney*, 141 Ariz. at 303, 686 P.2d at 1273 (internal quotation marks and citations omitted).  Thus, we review a trial court's ruling on juror misconduct and the decision on whether to strike for an abuse of discretion.  *State v. Moore*, 222 Ariz. 1, 10 ¶ 37, 213 P.3d 150, 159 (2009); *Dann III*, 220 Ariz. at 370 ¶ 106, 207 P.3d at 623.  We presume that jurors are impartial absent evidence to the contrary.  *See Lockhard v. McCree*, 476 U.S. 162, 184 (1986).

**¶101**        Payne alleges that Juror 28 made several statements during trial that raised questions about her impartiality.  In a conference in chambers, another juror said that Juror 28 mocked witnesses and complained about defense witnesses.  The juror was concerned because, while Juror 28 made the comments "[u]nder her breath," the reporting juror thought they were "loud enough to where there's the possibility of the prosecution" or a detective at counsel table hearing her.  Counsel for the State denied hearing more than "exasperated sighs, from both sides," and stated the detective had not heard anything either.

**¶102**        Although he did not ask to question Juror 28, Payne asked the court to designate her as an alternate and excuse her, citing concerns that she was disruptive and inappropriately sharing opinions.  The court denied these requests and instead reread the admonition to the jury.

**¶103**        Judges must respond to a claim of juror misconduct in a manner "commensurate with [its] severity."  *State v. Miller*, 178 Ariz. 555, 557, 875 P.2d 788, 790 (1994).  Here, the complaining juror said that Juror 28's comments were annoying, but they did not reveal that she was biased or had made up her mind before hearing all the evidence.  Neither the State nor the defense heard the comments, and no evidence shows that other members of the jury heard them.  In these circumstances, the rereading of the admonition was a response commensurate with the

severity of the alleged misconduct. Therefore, the trial judge did not abuse his discretion by refusing to strike Juror 28 or designate her as an alternate.

**¶104** Payne now argues that a mistrial should have been granted. We review this decision for fundamental error. *See Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607. As it was not an abuse of discretion to refuse to strike Juror 28, it was not fundamental error to not order a mistrial based on her conduct.

### K. Prosecutorial Misconduct

**¶105** Payne contends that the prosecutor committed misconduct by vouching for a witness, suggesting through facts not in evidence that Payne was a "bad man," improperly leading witnesses, improperly extracting a diagnosis from a defense expert, and commenting on Payne's invocation of his right to remain silent. Payne claims these acts constituted individual and cumulative prosecutorial misconduct.

**¶106** In reviewing prosecutorial misconduct claims, we first review each allegation individually for error. *See Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403. We will find an error harmless if we can say beyond a reasonable doubt that it did not affect the verdict. *See, e.g.*, *State v. Nelson*, 229 Ariz. 180, 189 ¶ 36, 273 P.3d 632, 641, *cert. denied*, 133 S. Ct. 131 (2012). We then consider whether the cumulative effect of individual allegations "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Hughes*, 193 Ariz. 72, 79 ¶ 26, 969 P.2d 1184, 1191 (1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

#### 1. Vouching

**¶107** In closing argument, Payne's counsel argued that Gonzales was more culpable than Payne, yet she was allowed to plead guilty to second degree murder. Payne argued this showed that he was guilty of, at most, second degree murder. In rebuttal, the State argued that it was inappropriate to use Gonzales's plea agreement as a basis for comparing culpability:

Reina Gonzales was given a plea agreement in this case so the State could provide you with testimony about what happened to those children, what really happened to those children.

The Judge is not going to give you an instruction saying if you find Reina Gonzales was given a second degree plea, therefore you can assign the defendant the same culpability that Reina Gonzales was given through the plea.

The only thing that you get to consider that plea agreement for is whether or not it impacts Reina Gonzales'[s] credibility or bias in this case. Not to compare guilt, not [to] compare culpability, and not to somehow use it as a measure of this man's responsibility in the deaths of his children.

¶108　　　　Payne claims that the State's argument improperly vouched for Gonzales's testimony by referring to "what really happened." Because Payne objected at trial, we review to determine whether the prosecutor's conduct was improper and for harmless error.

¶109　　　　Prosecutorial vouching occurs if, among other things, "the prosecutor suggests that information not presented to the jury supports" the evidence, testimony, or witness. *State v. Vincent*, 159 Ariz. 418, 423, 768 P.2d 150, 155 (1989). When improper vouching occurs, the trial court can cure the error by instructing the jury not to consider attorneys' arguments as evidence. *See Newell*, 212 Ariz. at 403 ¶¶ 67-68, 132 P.3d at 847; *State v. Lamar*, 205 Ariz. 431, 441 ¶ 54, 72 P.3d 831, 841 (2003).

¶110　　　　The prosecutor's comment that Gonzales would testify about "what really happened," considered alone, could be interpreted to suggest the prosecutor's knowledge that Gonzales was telling the truth, thereby improperly bolstering Gonzales's testimony by lending the "prestige" of the government. *See Vincent*, 159 Ariz. at 423, 768 P.2d at 155. But the prosecutor immediately followed these three words by discussing the jurors' duty to evaluate Gonzales's truthfulness.

**¶111**      A prosecutor may elicit testimony that a witness agreed to testify truthfully as part of a plea. *See Lamar*, 205 Ariz. at 441 ¶ 52, 72 P.3d at 841; *State v. McCall*, 139 Ariz. 147, 159, 677 P.2d 920, 932 (1983). Moreover, in a fact situation much like this one, we found no error in a prosecutor's passing statement that the witness told police "exactly what happened." *State v. King*, 180 Ariz. 268, 276-77, 883 P.2d 1024, 1032-33 (1994).

**¶112**      Here, Payne referenced Gonzales's plea agreement to encourage the jurors to compare her culpability to Payne's. The prosecutor's response attempted to clarify that the jurors should not compare culpability based on Gonzales's plea agreement, but could consider the plea in determining Gonzales's credibility and assessing her veracity. This was a reasonable response to Payne's argument.

**¶113**      Additionally, the trial court instructed the jurors that the lawyers' arguments were not evidence and that they should consider each witness's motive or prejudice. These instructions were sufficient to dispel any taint if vouching occurred. *See Newell*, 212 Ariz. at 403 ¶ 68, 132 P.3d at 847. We find any vouching error harmless.

2.      Innuendo

**¶114**      Payne claims that the trial court erred by denying his motion for a mistrial after the prosecutor improperly implied that he filed a CPS report that triggered an investigation of the children's mother, Jamie Hallam. We review the trial court's ruling for abuse of discretion. *Id.* at 402 ¶ 61, 132 P.3d at 846.

**¶115**      In 2005, CPS investigated Hallam for substance abuse. During re-direct, the prosecutor asked Hallam if she knew who had reported her drug use to CPS. When she replied that she did not, the prosecutor asked: "For all you know, that could have been Chris Payne?" She replied that she did not know. Payne objected and moved for a mistrial because he claimed that "not a shred of evidence" suggested that he made the report. The State responded that Payne's statement to police that he got involved with the children because of Hallam's drug use provided a good faith basis for the question. The trial court denied the

motion.

**¶116** Counsel's "[s]uggestion by question or innuendo of unfavorable matter which is not in evidence and which would be irrelevant, or for which no proof exists[,] is improper and can constitute misconduct." *Pool v. Superior Court* (*Fahringer*), 139 Ariz. 98, 103, 677 P.2d 261, 266 (1984).

**¶117** The prosecutor did not commit misconduct by asking if Payne filed the report with CPS because in his post-arrest statement, Payne said several times that the children were malnourished when they arrived at his home and that he suspected Hallam of leaving them with strangers while she was high on methamphetamine. Based on these statements, and absent other information to the contrary, the State had a good-faith basis for the question. Moreover, we fail to see how possibly reporting Hallam constitutes evidence "unfavorable" to Payne. Thus, the trial court did not abuse its discretion by denying Payne's mistrial motion.

### 3. Improper questioning

**¶118** During the prosecutor's direct examination of witnesses, Payne objected to several questions as leading or assuming facts not in evidence. He asserts, with little analysis, that the prosecution's questioning violated his due process rights, deprived him of a fair trial, and constituted prosecutorial misconduct. We ordinarily begin by reviewing the trial court's ruling on the objections for abuse of discretion. *See State v.* (*Joseph W.*) *King*, 66 Ariz. 42, 49, 182 P.2d 915, 919 (1947). But Payne does not analyze the questions individually, instead suggesting a pattern of prosecutorial misconduct that denied him due process. Thus, we analyze this line of questioning as a whole.

**¶119** Leading questions suggest an answer. *State v. Simoneau*, 98 Ariz. 2, 5, 401 P.2d 404, 407 (1965). Ordinarily, courts should not permit leading questions on direct examination, Ariz. R. Evid. 611(c), although such questions may be permitted when doing so will serve "the ends of justice," *Joseph W. King*, 66 Ariz. at 49, 182 P.2d at 919. No error occurs, however, when the answer suggested "had already been received as the result of proper questioning." *State v. Garcia*, 141 Ariz. 97, 101, 685 P.2d

734, 738 (1984).

**¶120** The questions that Payne complains of here took various forms. Some were leading; others, although not leading, suggested facts not in evidence. But the facts assumed in these questions could have been, and many were, elicited through proper questioning or were otherwise inconsequential. Other questions were not improper for any reason Payne raises on appeal. Payne presented no evidence that the prosecutor deliberately misframed questions, and many of Payne's objections were sustained, after which the prosecutor rephrased the question. Furthermore, the trial court instructed the jurors not to consider responses to any question for which it had sustained an objection. The trial court sustained several objections and issued curative instructions. We assume the jurors followed those instructions, *see State v. Prince*, 204 Ariz. 156, 158 ¶ 9, 61 P.3d 450, 452 (2003), and did not consider the questions to which objections were sustained. In light of these circumstances, and in the absence of any showing of intentional misconduct, no reversible error occurred.

### 4. ASPD "diagnosis" in penalty phase

**¶121** In the mitigation portion of the trial, Payne called Dr. Thomas Reidy to testify that Payne had risk factors for irregular psychological development, which might have made him more apt to abuse children. Payne claims that, on cross-examination, the State improperly elicited a diagnosis of Anti-Social Personality Disorder ("ASPD") from Dr. Reidy.

**¶122** To prepare to testify, Dr. Reidy reviewed records and transcripts of interviews, but he did not evaluate Payne or interview anyone familiar with him. After Payne's direct examination of Dr. Reidy, the trial court denied Payne's objection to the State questioning Dr. Reidy about the criteria for ASPD or whether Payne met these criteria. The court, however, warned the State not to reference a "diagnosis" of ASPD. On cross-examination, the State asked Dr. Reidy whether Payne satisfied the criteria for ASPD to prove an alternative explanation for Payne's behavior.

¶123     The prosecution may introduce any evidence in the penalty phase "that is relevant to any of the mitigating circumstances . . . , regardless of its admissibility under the rules governing admission of evidence at criminal trials."  A.R.S. § 13-751(C); *see also State v. VanWinkle*, 230 Ariz. 387, 394 ¶ 28, 285 P.3d 308, 315 (2012).   The prosecutor's questioning here rebutted Payne's claims that he had a number of risk factors for being an abusive parent, which might have caused him to be abusive, by showing alternative explanations for Payne's conduct.

¶124     Payne relies on *State v. Lundstrom*, 161 Ariz. 141, 146, 776 P.2d 1067, 1072 (1989), and *State v. Moody*, 208 Ariz. 424, 461-62 ¶¶ 157-64, 94 P.3d 1119, 1156-57 (2004), for the proposition that the prosecution may not elicit a diagnosis that is not in evidence.  Payne's reliance is misplaced. In *Lundstrom*, we held it improper for experts to testify to "facts or data" if merely acting "as a conduit for another non-testifying expert's opinion." 161 Ariz. at 148, 776 P.2d at 1074; *see also Moody*, 208 Ariz. at 462 ¶ 165, 94 P.3d at 1157 (to same effect).  But the prosecutor did not use Dr. Reidy as a conduit through which to present another expert's opinion.  Instead, she sought to elicit Dr. Reidy's opinion that Payne showed factors consistent with the criteria for ASPD.   Moreover, Dr. Reidy did not give a "diagnosis" of ASPD.   Thus, the questioning did not constitute misconduct.   Because we find no error in the prosecutor's cross-examination, Payne's Eighth Amendment arguments also fail.

### 5.     Comment on Payne's right to silence in opening statement

¶125     Payne claims that the prosecutor improperly commented on his right to silence by referring, in her opening statement, to what Payne "is going to tell you."  At the conclusion of the opening statement, Payne moved for a mistrial, which the court denied.

¶126     We review a trial court's ruling on a motion for mistrial for abuse of discretion because the trial court is in the best position to determine the effect of any inappropriate statements.  *Newell*, 212 Ariz. at 402 ¶ 61, 132 P.3d at 846.   But because "the protection against self-incrimination includes freedom from adverse consequences flowing from defendant's exercise of his right," it is reversible error to refer to a

defendant's "protected silence," *State v. Carrillo*, 156 Ariz. 125, 128, 750 P.2d 883, 886 (1988), if jurors would "naturally and necessarily perceive it to be a comment on the defendant's failure to testify," *State v. Rutledge*, 205 Ariz. 7, 13 ¶ 33, 66 P.3d 50, 56 (2003).

**¶127** In her opening statement during the guilt phase, the prosecutor told the jury, "you are going to hear from the defendant himself. The interview that he gave to the police officers on March 1, 2007. And you are going to hear that he lied, too, in the beginning." In the next several sentences, the prosecutor referred to things the defendant said "throughout the interview." But then she started discussing what Payne is "going to tell you." Payne argues that each of these comments improperly directed the jury's attention to his exercise of his right not to testify.

**¶128** The State did not err in its opening statement by referring to comments Payne made in the taped interview. *See Rutledge*, 205 Ariz. at 14 ¶ 38, 66 P.3d at 57. The prosecutor's comments about what Payne "is going to tell you" are a closer call. Taken in context, however, they were not "calculated to direct the jurors' attention to [Payne's] exercise of his fifth amendment privilege" because they too referred to evidence from the taped interview. *See State v. McCutcheon*, 159 Ariz. 44, 45, 764 P.2d 1103, 1104 (1988). As such, the prosecutor's comments did not constitute reversible error and the trial court did not abuse its discretion in denying Payne's mistrial motion.

### 6. Comment on Payne's lack of emotion during trial

**¶129** Payne argues that, in closing arguments, the prosecutor improperly referred to Payne's lack of emotion during trial. Because he did not object, we review for fundamental error.[5]

**¶130** In its guilt-phase closing arguments, the State compared

---

[5] Payne claims that he preserved this issue by objecting to comments the State made in its opening statement about his taped interview. But this objection was unrelated to the as yet unmade references to his demeanor at trial. Payne's objection thus did not preserve this issue.

Payne's lack of emotion at trial to the excessive emotion he displayed during his interrogation. We have not confronted directly whether a prosecutor may ask jurors to consider a defendant's affect at trial, but most courts that have addressed this issue have found such comments improper. *See, e.g.*, *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008) (stating that "courtroom demeanor of a non-testifying criminal defendant is an improper subject for comment"); *United States v. Schuler*, 813 F.2d 978, 981 (9th Cir. 1987) (holding that, "in the absence of a curative instruction," a comment on "off-the-stand behavior" violates the due process clause); *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984) (to same effect); *United States v. Carroll*, 678 F.2d 1208, 1209-10 (4th Cir. 1982) (to same effect). *But see Cunningham v. Perini*, 655 F.2d 98 (6th Cir. 1981) (per curiam) (upholding comments because they referred to conduct and demeanor rather than failure to testify).

**¶131**     The differing results in these cases turn on the courts' views of the legitimate arguments on each side. We urge courts and prosecutors to proceed cautiously in this area, given its dubious relevance and potential to implicate a defendant's right not to testify. We decline to set forth an absolute rule that such statements are always improper, however, preferring to let trial courts assess the totality of the circumstances in each case. We caution that while the jury may observe a defendant's demeanor, a prosecutor's reference to the demeanor of a non-testifying defendant may draw attention to the defendant's failure to testify and is based on evidence not presented at trial and not covered by any jury instruction. *See Mendoza*, 522 F.3d at 491. Although we conclude that the State's comment here was improper, we do not find fundamental error.

### 7.     Question re lack of remorse in penalty phase

**¶132**     Payne claims that it was improper for the prosecutor to ask Dr. Reidy whether lack of remorse is a characteristic of ASPD. Payne objected and moved for a mistrial. The court overruled the objection and denied the motion. We review the trial court's ruling for abuse of discretion. *Newell*, 212 Ariz. at 402 ¶ 61, 132 P.3d at 846.

**¶133**     The prosecutor's question here did not ask about Payne's remorse, but rather asked whether lack of remorse was a factor in

determining ASPD. It was one of several questions rebutting Payne's suggestion that risk factors in his background led Payne to abuse his children. Thus, although Payne did not raise remorse as a mitigating factor, the questioning was relevant and not unduly prejudicial. It therefore was not improper.

### 8. Cumulative error

**¶134** Payne claims that the prosecutor's comments gave rise to reversible cumulative error. In analyzing such issues, we examine whether the cumulative effect of individual allegations "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hughes*, 193 Ariz. at 79 ¶ 26, 969 P.2d at 1191 (quoting *Donnelly*, 416 U.S. at 637). Cumulative error warrants reversal only if misconduct was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial," *id.* (quoting *State v. Atwood*, 171 Ariz. 576, 611, 832 P.2d 593, 628 (1992)), indicating that "the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant," *Roque*, 213 Ariz. at 228 ¶ 155, 141 P.3d at 403 (internal quotation marks omitted).

**¶135** Payne has not shown misconduct that permeated the trial and infected it with unfairness, and so we reject his claim of cumulative error.

### L. Aggravation Phase Jury Instructions

**¶136** Payne challenges several sentencing instructions. We review the trial court's decision to refuse a requested instruction for an abuse of discretion, *Johnson*, 212 Ariz. at 431 ¶ 15, 133 P.3d at 741, and review de novo whether the trial instructions as a whole correctly state the law, *State v. Bocharski*, 218 Ariz. 476, 487 ¶ 47, 189 P.3d 403, 414 (2008).

### 1. § 13-751(F)(8): "one or more other homicides"

**¶137** Payne argues that the trial court erred by failing to detail the elements required for the jury to find the (F)(8) aggravating circumstance. The instruction given stated: "the defendant has been convicted of one or

more other homicides, and those homicides were committed during the commission of the offense."  Payne correctly notes that this instruction was insufficient because it fails to inform the jurors that they must find a temporal, spatial, and motivational relationship between the homicides. *See Dann III*, 220 Ariz. at 364 ¶ 57, 207 P.3d at 617.  Because Payne neither requested further instructions nor objected at trial, however, we review for fundamental error. *See State v. Hargrave*, 225 Ariz. 1, 14 ¶47, 234 P.3d 569, 582 (2010).  We have previously found harmless error when the temporal, spatial, and motivational relationship requirements were not submitted to a jury if no jury could have found them unsatisfied. *See State v. Dann* (*Dann II*), 206 Ariz. 371, 374 ¶ 11, 79 P.3d 58, 61 (2003).

**¶138**        A conviction for multiple homicides, by itself, does not satisfy the (F)(8) aggravator. *Ellison*, 213 Ariz. at 143 ¶ 128, 140 P.3d at 926.  "[T]he State must establish beyond a reasonable doubt that the murders took place during a 'continuous course of criminal conduct' and were 'temporally, spatially, and motivationally related.'" *Moore*, 222 Ariz. at 16 ¶ 86, 213 P.3d at 165 (quoting *Armstrong III*, 218 Ariz. at 464 ¶ 67, 189 P.3d at 391).

**¶139**        Payne does not dispute that the murders were spatially related, but argues that the State failed to prove temporal proximity and motivational relationship.

**¶140**        Payne asserts that as much as a week might have passed between the deaths of Ariana and Tyler, and thus the temporal proximity requirement is not met.  We begin by clarifying that the focus is on the temporal relationship of the conduct causing the deaths rather than the deaths themselves.  For example, if a defendant shoots two victims during a robbery, but one survives for a week, the temporal proximity requirement is satisfied.  Substantial evidence showed that Payne locked his children in a closet and starved them to death over several months.  No reasonable jury could fail to find the temporal requirement satisfied.

**¶141**        Payne also argues that the motivational element is not satisfied because "a motive was never established."   But the State presented evidence that the children were locked in a closet and starved — the acts that eventually killed them — because they bothered Gonzales,

hindered Payne's work, and were otherwise "inconvenient." No evidence suggested that Payne killed each child for a different reason. *See Ellison*, 213 Ariz. at 144 ¶ 130, 140 P.3d 927 (motivational element satisfied when defendant did not claim killing victims for different reasons); *see also Armstrong III*, 218 Ariz. at 464 ¶¶ 68-70, 189 P.3d at 391 ("[t]he motives for killing each victim need not be identical"; motivationally related when defendant "hated" second victim and hate arose from motive in killing first victim). Although the (F)(8) instruction given was deficient, Payne has failed to show fundamental error because no rational jury would have failed to find a temporal, spatial, and motivational relationship between the murders of Ariana and Tyler.

### 2. § 13-751(F)(6): "especially heinous, cruel or depraved manner"

**¶142** Payne claims that the instruction given for the (F)(6) aggravator was overbroad and insufficient because it led the jury to believe a negligent state of mind was sufficient to establish the (F)(6) factor. The court instructed that, to find the especially cruel aggravating factor, the jury must find that "the defendant intended, knew, or should have foreseen" that the victims would suffer mental anguish or physical pain. Payne did not object at trial, so we review for fundamental error. *See Hargrave*, 225 Ariz. at 14 ¶ 47, 234 P.3d at 582.

**¶143** We note initially that the expression "should have foreseen" seems simply to have been used in lieu of the proper phrase "should have known." Nonetheless, Payne correctly observes that we held in *State v. Carlson*, 202 Ariz. 570, 582 ¶ 44, 48 P.3d 1180, 1192 (2002), that the tort concept of "foreseeability" is insufficient to support the finding of the aggravating circumstance. But *Carlson* was analyzing the mental state for the unobserved acts of an accomplice and is therefore inapposite. *Id.* at 581-82 ¶ 43, 48 P.3d at 1191-92.

**¶144** In this case, the State presented substantial evidence that Payne locked his children in a closet to live in darkness and filth, suffering from injuries while they slowly starved to death, which he either knew or should have known would cause them to suffer mental anguish and physical pain. This type of involvement differs from the accomplice in

*Carlson* who had no reason to believe her victim would suffer. No reasonable jury could find that Payne would not have known that the children would suffer as they starved to death in the dark closet. Thus, although the instruction was erroneous, no fundamental error occurred.

### 3. *Enmund* and *Tison* findings

**¶145** Payne argues that the trial court deprived him of his constitutional rights by failing to require the jurors to make an explicit finding that he "kill[ed], attempt[ed] to kill, or intend[ed] that a killing [would] take place or that lethal force [would] be employed" under *Enmund v. Florida*, 458 U.S. 782, 797 (1982), or that he was a major participant in a crime and acted with reckless indifference to human life under *Tison v. Arizona*, 481 U.S. 137, 158 (1987). The trial court did not instruct the jury to make this determination in the aggravation phase, and Payne did not object or ask for the findings to be made. But he now claims this omission constituted fundamental error.

**¶146** By statute, the jury must make all factual determinations necessary to impose a death sentence. *See* A.R.S. § 13-752(P). Payne argues that this includes explicit *Enmund/Tison* findings.

**¶147** The jurors unanimously convicted Payne of premeditated murder, meaning that they found that he personally intended to cause or knew his conduct would cause the deaths of the children. Thus, there was no need for a separate finding that he was a major participant in the crimes. There was no fundamental error. *Cf. State v. Joseph*, 230 Ariz. 296, 300 ¶ 18, 283 P.3d 27, 31 (2012) (failure to instruct on *Enmund/Tison* was not an abuse of discretion where defendant was sole participant in murder).[6]

### 4. Voluntary intoxication consideration

**¶148** Payne argues that the jury was unconstitutionally prevented from considering his drug use as a defense to the culpable mental state

---

[6] In cases involving felony murder where an accomplice is involved, trial courts should give the *Enmond/Tison* instruction.

necessary for the (F)(6) aggravating circumstance. In his closing argument in the aggravation phase, Payne argued that his drug use prevented him from having sufficient mental ability to intend to cause physical pain or mental anguish. The State responded that voluntary intoxication is not a defense to a culpable mental state. The final instructions submitted to the jury noted that instructions from previous phases still applied, which included an instruction that voluntary intoxication is not a defense to a crime involving a culpable mental state such as knowledge or intent, but did not specifically address voluntary intoxication from drug use in connection with the (F)(6) "heinous, cruel or depraved" aggravator. Payne did not object to the instruction or the State's argument. We thus review for fundamental error. *See Hargrave*, 225 Ariz. at 14 ¶ 47, 234 P.3d at 582.

**¶149**       Section 13-503 provides that "[t]emporary intoxication . . . is not a defense for any criminal act or requisite state of mind." The focus of the heinous and depraved aggravator is the defendant's state of mind. *See State v. Womble*, 225 Ariz. 91, 100 ¶ 34, 235 P.3d 244, 253 (2010). The statute therefore prohibits the jury from using voluntary intoxication to negate intent — that is, the jury could not consider voluntary intoxication as a basis for concluding that the defendant lacked the state of mind for the (F)(6) aggravating circumstance. *Cf. State v. Boyston*, 231 Ariz. 539, 550 ¶¶ 52, 54, 298 P.3d 887, 898 (2013) (concluding court did not err by excluding evidence of voluntary intoxication on the issue of premeditation).

**¶150**       Payne claims, however, that he has a constitutional right to rebut the (F)(6) aggravator with evidence of intoxication. The Supreme Court has held that in the guilt phase there is no due process violation when a state prohibits juries from considering voluntary intoxication. *Montana v. Egelhoff*, 518 U.S. 37, 56 (1996). Furthermore, the Eighth Amendment ensures that defendants have the opportunity to argue that the intoxication warranted leniency, which Payne was permitted to do in the penalty phase. The trial court's instructions correctly stated the law; thus, there was no fundamental error.

## M.    Consideration of Age of Victims

¶151    Payne argues that the jury twice considered the victims' ages, once when finding the "heinous, cruel or depraved" factor and again when considering the "age of the victim" aggravator.  But we have held that "[a] jury, like a sentencing judge, may use one fact to find multiple aggravators, so long as the fact is not weighed twice when the jury assesses aggravation and mitigation."  *State v. Velazquez*, 216 Ariz. 300, 307 ¶ 22, 166 P.3d 91, 98 (2007).  In its final instructions, the court admonished the jury that "you may only consider the age of the children once" in assessing aggravation and mitigation.  Absent evidence to the contrary, we presume the jury followed the instructions.  *Id.* ¶ 24.

¶152    Payne argues that there was insufficient evidence to establish the factors that can make a murder cruel, heinous, or depraved, leaving the age as the sole basis for proving the aggravator.  We have concluded, however, that substantial evidence supported the jury's finding that the murders were especially cruel.  *See supra* ¶¶ 142-44.  Thus age was not the sole factor supporting the jury's finding of that factor.

## N.    Mitigating Evidence

¶153    Payne argues that the trial court deprived him of a fair trial by precluding some of his mitigation evidence during the penalty phase.  We review evidentiary rulings and discovery sanctions for abuse of discretion.  *Armstrong III*, 218 Ariz. at 458 ¶ 20, 189 P.3d at 385; *State v. Towery*, 186 Ariz. 168, 186, 920 P.2d 290, 308 (1996).

### 1.    Dr. Biggan

¶154    Payne argues that the trial court erred by precluding Dr. Biggan from testifying after Payne failed to timely disclose her.  Dr. Biggan is a psychologist who evaluated Payne in November 2008.  The defense did not disclose her report, but the State discovered it after trial had begun.  About two weeks later, less than two days before the penalty phase began, the defense disclosed Dr. Biggan as a mitigation witness.  On the State's motion, the trial court precluded Dr. Biggan's testimony.

¶155    Rule 15.7 of the Arizona Rules of Criminal Procedure permits the court to sanction a party who fails to timely disclose evidence. But any sanction must be proportional to the violation and must have "a minimal effect on the evidence and merits." *Towery*, 186 Ariz. at 186, 920 P.2d at 308. Factors to consider include importance of the witness or evidence, the degree of surprise, and bad faith. *See id.*

¶156    Given these factors, the court did not abuse its discretion by precluding Dr. Biggan from testifying. Payne sought to call her to show that he could not conform his conduct to the law because of executive functioning deficiencies. Although such evidence would be relevant to a statutory mitigating circumstance, because he did not make an offer of proof, Payne has not established the importance of Dr. Biggan's evidence. Indeed, most of Dr. Biggan's report showed that Payne had relatively normal functioning. And the surprise was substantial as the disclosure two days before the penalty phase deprived the State of the opportunity to interview Dr. Biggan or obtain a rebuttal witness.

## 2.    "Good inmate" evidence

¶157    Payne sought to present evidence that he was a "good inmate" as a mitigating factor. Finding good behavior in jail irrelevant, the trial court precluded the evidence. We have recognized that good inmate evidence can be mitigating, but it is generally afforded little weight. *See, e.g.*, *State v. Pandeli*, 215 Ariz. 514, 533 ¶ 82, 161 P.3d 557, 576 (2007). Thus the trial court erred. Because Payne objected to this error below, we must determine whether preclusion of the good inmate evidence was harmless. *See Bible*, 175 Ariz. at 588, 858 P.2d at 1191. To determine harmlessness, we assess the effect of "the error in light of all of the evidence" presented in the case. *Id.* We must be able to "say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict." *Id.*

¶158    After reviewing the record, we find the erroneous preclusion of "good inmate" evidence harmless beyond a reasonable doubt. We conclude, as we did in *Bible*, that "[i]f the evidence against Defendant had been closely balanced, strong, or even very strong, . . . it would be impossible to say beyond a reasonable doubt that the [precluded]

evidence did not affect the verdict. . . . Factually, however, this is a very unusual case." *Id.* Virtually undisputed evidence established that Payne locked his children in a closet and starved them to death. We conclude beyond a reasonable doubt that any evidence that Payne was a good inmate or that he incurred no disciplinary infractions while incarcerated would not have moved any juror to recommend leniency or otherwise have affected any juror's decision regarding the appropriate sentence. If improperly excluded mitigation evidence may ever be considered harmless, surely this is the case.

¶159 We thus conclude beyond a reasonable doubt that in light of the horrific nature of Payne's crimes, the strength of the aggravators proved, *see State v. Hampton*, 213 Ariz. 167, 185 ¶ 90, 140 P.3d 950, 968 (2006) (stating that the "multiple homicides aggravator is of extraordinary weight"), and the weakness of the "good inmate" mitigator along with the other mitigation evidence Payne presented, *see Pandeli*, 215 Ariz. at 533 ¶ 82, 161 P.3d at 576 (affording good inmate evidence little weight "because prisoners are expected to behave"), the result would not have changed had this error not occurred. If, as the dissent suggests, preclusion of the "good inmate" mitigator requires reversal in this case, then preclusion of a mitigator would require reversal in every case. Such a result would effectively eviscerate harmless error review and mean that exclusion of any piece of mitigation evidence, no matter how minor, is structural error, which is contrary to our case law. *See Anderson I*, 197 Ariz. at 323 ¶ 22, 4 P.3d at 378 (explaining that erroneous evidentiary rulings are subject to harmless error analysis); *see also State v. Tucker*, 215 Ariz. 298, 316 ¶ 66, 160 P.3d 177, 195 (2007) (noting that "[w]e have recognized structural error in only a few instances").

## O. Penalty Phase Rebuttal Evidence

¶160 Payne contends that the trial court committed reversible error in the penalty phase by permitting the State to elicit information about his criminal history and admitting a DVD of Payne's jail visit with his father. This Court reviews evidentiary rulings for abuse of discretion. *Armstrong III*, 218 Ariz. at 458 ¶ 20, 189 P.3d at 385. Evidence is admissible in the penalty phase if it is relevant to rebut the primary thrust of mitigating evidence and it is not unduly prejudicial. *See Hampton*, 213

Ariz. at 180 ¶ 51, 140 P.3d at 963.

### 1.    Payne's criminal history

**¶161**    Payne's criminal history was relevant to rebut Payne's assertion that "risk factors" made him a poor parent. Recognizing the potential prejudice that may arise from criminal history, the trial court directed the State not to elicit details that would cause undue prejudice. The State elicited reports of domestic violence, threats of violence, and deceit to police. A summary was admitted into evidence. In light of the limits it imposed, the trial court did not abuse its discretion.

### 2.    Jailhouse DVD

**¶162**    The State introduced a DVD of Payne's father's visit with Payne at the jail to rebut Payne's claim that he was a caring person when not on drugs. Payne objected on grounds of prejudice and irrelevance. The video focuses on a discussion regarding Payne's son, Christopher Jr. It shows Payne berating his father and demeaning family members for not doing enough to ensure that Christopher is properly cared for. Although the DVD was only marginally probative, playing it did not unfairly prejudice Payne because, while it showed Payne yelling at his father, it also showed that he cared about his son. *See* Ariz. R. Evid. 403 (balancing probative value and danger of unfair prejudice). Therefore, the court did not abuse its discretion in allowing it to be played.

## III.  ABUSE OF DISCRETION REVIEW

**¶163**    Because the murders occurred after August 1, 2002, we review the jury's finding of aggravating factors and the imposition of a death sentence for abuse of discretion. A.R.S. § 13-756(A). Evidence is sufficient to support the finding of an aggravating circumstance if reasonable persons could conclude it establishes the circumstance beyond a reasonable doubt. *See State v. Gallardo*, 225 Ariz. 560, 565 ¶ 15, 242 P.3d 159, 164 (2010). We must uphold a jury's decision that death is appropriate if any "reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Id*. at 570 ¶ 51, 242 P.3d at 169 (quoting *State v. Morris*,

215 Ariz. 324, 341 ¶ 81, 160 P.3d 203, 220 (2007)).

## A.    Aggravating Circumstances

**¶164**    The jury found three aggravating factors:  (1) the murders were committed in an especially cruel, heinous, or depraved manner, A.R.S. § 13-751(F)(6); (2) one other homicide was committed during the commission of the offense, *id.* § 13-751(F)(8); and (3) the victims were under the age of fifteen and the defendant was over the age of eighteen, *id.* § 13-751(F)(9).  Payne does not dispute the third aggravator, but does dispute the first two.  Because we have earlier set forth our reasoning supporting the jury's finding of the (F)(6) factor based on cruelty, *see supra* ¶¶ 142-44, we do not address heinousness or depravity.  *State v. Gretzler* (*Gretzler II*), 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983) (noting that the (F)(6) aggravator is established if the jury finds that the State proved cruelty, heinousness, or depravity).  Regarding the (F)(8) factor, because we found that the jury instructions did not constitute fundamental error and that no reasonable jury could have found the additional elements not satisfied, *see supra* ¶¶ 137-41, we reject these arguments.  The jury did not abuse its discretion in finding all three aggravating circumstances.

## B.    Death Sentences

**¶165**    We will overturn a jury's imposition of a death sentence only if "no reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency."  *Cota*, 229 Ariz. at 153 ¶ 95, 272 P.3d at 1044 (citation and internal quotation marks omitted).  Payne alleged a variety of mitigating factors, including a substantial number of "risk factors" for becoming an abusive and neglectful parent, "insufficient protective factors" to guide him in the right direction, a difficult childhood, lack of family support, substance abuse, lack of a felony criminal history, and the inability to appreciate the wrongfulness of his conduct.  The State presented some rebuttal evidence and argued that the jury should give many of Payne's mitigating factors little weight.

**¶166**    Even if we assume Payne proved each mitigating factor he alleged, the jury did not abuse its discretion by finding them insufficient

to warrant leniency.

## IV. CONCLUSION

**¶167** For the foregoing reasons, we affirm Payne's convictions and sentences.[7]

---

[7] Payne listed fourteen claims "to avoid preclusion" and the previous opinions rejecting those claims, which we decline to revisit.

VICE CHIEF JUSTICE BALES, concurring in part and dissenting in part:

**¶168** I concur with the affirmance of the convictions and with the majority's conclusions regarding the penalty phase rebuttal evidence and the preclusion of Dr. Biggan's testimony. However, I respectfully dissent from the majority's conclusion that the erroneous exclusion of Payne's "good inmate" evidence was harmless.

**¶169** Payne sought to offer this evidence as mitigation and objected to its exclusion at the penalty phase. The Eighth and Fourteenth Amendments require that the sentencer in a capital case be allowed to consider any relevant mitigating evidence, *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), and it is well established that the defendant's good behavior while incarcerated is relevant to mitigation. *Skipper v. South Carolina*, 476 U.S. 1, 4-9 (1986) (finding *Lockett* error where exclusion of evidence of good behavior in prison "impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender").

**¶170** The State argues that the improper exclusion of this evidence was harmless and therefore should not affect Payne's death sentences. The United States Supreme Court has never held that the exclusion of relevant mitigation evidence from the penalty phase of a capital trial was harmless error, although it has used language suggesting this possibility. *See, e.g.*, *Hitchcock v. Dugger*, 481 U.S. 393, 399 (1987) (noting that improper exclusion of mitigating evidence renders death sentence invalid absent showing that error was harmless or had no effect); *Skipper*, 476 U.S. at 8 (observing that state's characterization of "exclusion as harmless is implausible on the facts before us"). Following that suggestion, many lower courts have reviewed the exclusion of mitigating evidence for harmless error. *See, e.g.*, *Campbell v. Bradshaw*, 674 F.3d 578, 596-98 (6th Cir. 2012) (applying harmless error review); *Ferguson v. Sec'y for Dep't of Corr.*, 580 F.3d 1183, 1201-02 (11th Cir. 2009) (same); *Bryson v. Ward*, 187 F.3d 1193, 1205 (10th Cir. 1999) (same).

**¶171** Even assuming that harmless error analysis may apply in some circumstances involving the exclusion of mitigating evidence, I cannot agree with my colleagues that the State has met its burden of

50

establishing that the error was harmless here. My conclusion reflects the nature of both the State's burden and the jury's sentencing determination.

**¶172** For an error to be harmless, the *State* must establish beyond a reasonable doubt that the error did not contribute to or affect the verdict. *State v. Gunches*, 225 Ariz. 22, 26 ¶ 24, 234 P.3d 590, 594 (2010). "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *State v. Anthony*, 218 Ariz. 439, 446 ¶ 39, 189 P.3d 366, 373 (2008) (internal quotation marks omitted). Thus, in the context of a jury's determination to impose a death sentence, the State must establish beyond a reasonable doubt that the error did not influence the verdict rendered by the jurors who actually considered the evidence. *See Gunches*, 225 Ariz. at 26 ¶¶ 24-25, 234 P.3d at 594.

**¶173** Especially when, as occurred here, the trial court erroneously excludes an entire category of mitigating evidence, the State faces an almost insurmountable burden in establishing that the error was harmless. *Cf. People v. Davis*, 706 N.E.2d 473, 488 (Ill. 1998) (holding that the State did not meet its burden of showing that the sentencing judge's refusal to consider all mitigating evidence regarding good jail behavior was harmless); *Irving v. State*, 498 So.2d 305, 316 (Miss. 1986) (distinguishing *Skipper* in case involving exclusion of evidence of good behavior in prison in part because "no particular *type* of evidence was excluded, as in *Skipper* — the exclusion was more that of degree").

**¶174** The State's high burden reflects the nature of jury sentencing in capital cases.

> [T]he determination whether mitigation is sufficiently substantial to warrant leniency is not a fact question to be decided based on the weight of the evidence, but rather is a sentencing decision to be made by each juror based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist.

*State ex rel. Thomas v. Granville (Baldwin)*, 211 Ariz. 468, 473 ¶ 21, 123 P.3d

662, 667 (2005). "A mitigating factor that motivates one juror to vote for a sentence of life in prison may be evaluated by another juror as not having been proved or, if proved, as not significant to the assessment of the appropriate penalty." *Id.* at 473 ¶ 18, 123 P.3d at 667.

¶175 Because our law never presumes that death is the appropriate penalty, and each juror must, as a matter of constitutional law, be allowed to assign such weight to mitigating evidence as he or she believes appropriate, *see id.,* I do not believe that we can uphold Payne's death sentence by asserting that the exclusion of evidence about his behavior while incarcerated could not have influenced the verdict of any "reasonable" juror. Nor does the fact that we, in cases involving our independent review, have characterized "good inmate" evidence as a relatively weak mitigating factor suggest that each juror here would have viewed such evidence in the same way.

¶176 A jury that considers the excluded evidence along with other mitigating evidence and the aggravating factors may likely conclude that Payne should be sentenced to death. But under our case law and the Eighth and Fourteenth Amendments as interpreted by the Supreme Court, that observation does not establish that the trial court's precluding the sentencing jury from considering an entire category of mitigating evidence was harmless. Accordingly, I would vacate the death sentences and remand the case to superior court for a new penalty phase in which Payne's proffered good-inmate evidence should be admitted.